Robert Dewey GLOCK, Petitioner–Appellant,

v.

Harry K. SINGLETARY, Respondent–Appellee.

No. 91–3528.

United States Court of Appeals, Eleventh Circuit.

Oct. 7, 1994.

Martin J. McClain, Chief Asst. Capital Collateral, Representative, Gail E. Anderson, Office of Capital Collateral, Representative, Tallahassee, FL, for appellant.

Robert J. Landry, Asst. Atty. Gen., Dept. of Legal Affairs, Tampa, FL, for appellee.

Before TJOFLAT, Chief Judge, KRAVITCH and HATCHETT, Circuit Judges.

TJOFLAT, Chief Judge:

Robert Dewey Glock II is a Florida prison inmate. In 1983, a jury convicted him, along with his codefendant Carl Puiatti, of one count each of first degree murder, kidnapping, and robbery. The jury recommended that both Glock and Puiatti receive the death penalty for the murder; the trial court ac-

cepted the jury's recommendations and sentenced the defendants accordingly. After failing to obtain relief through a direct appeal and state collateral attacks, Glock filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 2254 (1988), seeking the vacation of both his murder conviction and his death sentence.

The district court dismissed Glock's petition, concluding that, on its face, the petition failed to state a valid claim for relief, 752 F.Supp. 1027. Glock appeals. Finding no merit in Glock's attack on his murder conviction, we affirm the district court's refusal to disturb that conviction. Glock's death sentence must be set aside, however, because the trial court, at the conclusion of the sentencing phase of Glock's trial, failed to provide the jury with an adequate instruction regarding the "heinous, atrocious, or cruel" aggravating circumstance that was relied upon by the State as a ground for seeking the death penalty. We therefore direct the district court to issue the writ with respect to Glock's death sentence.

## I.

### A.

On the morning of August 16, 1983, Glock and Puiatti confronted a woman as she attempted to exit her vehicle at a shopping mall in Bradenton, Florida, forcing her back inside her car at gunpoint. As Puiatti drove from the mall, Glock took fifty dollars from the victim's purse. Glock and Puiatti then coerced the victim into cashing a $100 check at her bank.

With the proceeds of the check in hand, the pair drove the victim across South Florida, eventually arriving at an orange grove outside Dade County where they took the victim's wedding ring and abandoned her at the side of the road. After driving a short distance, however, the pair decided that the woman, if left alive, would be a potential witness against them and that she therefore should be killed. Glock and Puiatti returned

to where they had left the victim, whereupon Puiatti shot her twice at close range and drove away. Upon glancing back and realizing that the victim had not fallen to the ground, Puiatti turned the car around. Glock then took the gun and fired a third shot into the victim and Puiatti drove away once more. When the woman still did not fall, Glock and Puiatti made a third pass at which point Glock fired the shot that felled her; she died shortly thereafter.

Four days later, Glock and Puiatti were still in possession of the victim's vehicle when they were stopped in New Jersey by a state trooper who noticed that the automobile's license plate was displayed improperly. Neither Puiatti nor Glock was able to present the trooper with a valid driver's license, so the trooper asked to see the car's registration. As Puiatti opened the glove box, the trooper noticed a handgun inside. The trooper then seized the firearm, and with permission from Puiatti and Glock, searched the vehicle, thereby finding a second handgun. The officer arrested both men for possession of two handguns without permits. The handgun taken from the glove box proved to be the weapon used in the Florida slaying.

On August 21, the day following their arrests, Glock and Puiatti made separate tape recorded statements to two Pasco County, Florida, detectives,[1] in which each confessed to the Florida kidnapping, robbery, and killing. In his statement, Glock recounted the events described above, differing from that account in just two respects: Glock claimed that Puiatti had suggested initially that the two men kill the victim and that Puiatti had fired the final shot. Puiatti's statement, given later that day, was virtually identical to Glock's statement; not surprisingly, however, Puiatti claimed that the killing had been Glock's idea and that Glock had fired the last shot.

Three days later, on August 24, Glock and Puiatti gave the detectives a joint statement before a court reporter. Puiatti spoke first.

---

**1.** The two detectives took the statements in Burlington County, New Jersey, where Glock and

Puiatti had been taken following their arrests.

As Glock listened silently, Puiatti told the detectives that "[Glock] said to me that he thought we should shoot her ... [a]nd after going back and forth a little bit, I agreed, and turned the car around." Puiatti then admitted to firing the first shot, at which point Glock interrupted and continued the narration. Glock reported, and Puiatti agreed, that Puiatti initially fired three shots and that at least two of those shots struck the victim, one in the right shoulder and one in the chest. Glock continued, stating that he also shot the victim twice—once on the second pass in the car and once on the third. Glock also confessed that the victim collapsed after he shot her on the third pass.[2] At the conclusion of the joint statement, both men stated that they were in "full agreement with each other as to the [joint] statement ... [and] that the incident came down exactly that way."

### B.

On October 12, 1983, the State of Florida charged Glock and Puiatti with one count each of first degree murder, kidnapping, and robbery. Before trial, each defendant moved for separate trials because the State intended to present both of their individual confessions to the jury. The trial court denied their requests for severance and, in March 1984, Glock and Puiatti went to trial.[3]

At trial, the State introduced all three confessions into evidence as part of its case in chief. Glock and Puiatti each objected to the introduction of the other's individual statement. As each defendant's statement was received, the court instructed the jury to disregard it to the extent that it implicated the other defendant. With respect to the joint statement, no objection was made and no curative instruction was given. After the State rested its case, neither defendant took the stand to rebut the State's proof. The jury accepted the State's proof and convicted each defendant on all three counts.

The trial then proceeded to the penalty phase,[3] where the same jury was asked to make a recommendation as to whether Glock and Puiatti should be sentenced to life imprisonment or death. The State called no witnesses, relying instead upon the evidence adduced during the guilt phase of the trial. Glock, in his case, called a number of witnesses, including his sister and his stepmother, both of whom testified as to the difficult circumstances of Glock's childhood. Glock also presented a mental health expert who testified that Glock would not have committed the crimes but for the substantial domination exerted over him by Puiatti,[4] and that Glock, who did not have a criminal profile, was capable of rehabilitation and therefore was unlikely to commit any future crimes. Finally, Glock testified that he felt remorse over what he had done.

At the close of the evidence at the penalty phase, the trial judge instructed the jury to consider five statutory aggravating circumstances in reaching its recommendation concerning the defendants' respective sentences: whether the murder was committed: (1) while the defendant was engaged in the commission, the attempted commission, or the flight after the commission or attempted commission, of the crime of kidnapping, Fla. Stat.Ann. § 921.141(5)(d) (West 1985 & Supp. 1994); (2) for the purpose of avoiding or preventing a lawful arrest, Fla.Stat.Ann. § 921.141(5)(e); (3) for financial gain, Fla. Stat.Ann. § 921.141(5)(f); (4) in a "cold, calculated, and premeditated [manner] without any pretense of moral or legal justification," Fla.Stat.Ann. § 921.141(5)(i); or (5) in a manner that was "especially wicked, evil, atrocious or cruel," [5] Fla.Stat.Ann.

2. When questioned about the specific number of shots fired, Glock and Puiatti explained that they fired as many shots as they could, but that they were unable to fire the last bullet contained in the handgun because it jammed in the chamber.

3. Before the penalty phase began, Glock and Puiatti again moved for a severance, which the court denied.

4. Puiatti likewise sought to establish through psychiatric evidence that, at the time of the murder, he was under the substantial domination of Glock and that, but for his association with Glock, he would not have participated in the crimes.

5. Although the statutory language for this aggravating circumstance read "especially, heinous, atrocious, or cruel," the phrasing employed by the trial judge in instructing the jury was wheth-

§ 921.141(5)(h) (hereinafter, the "atrociousness circumstance").[6] The court also instructed the jury with respect to both statutory mitigating circumstances, *see* Fla.Stat. Ann. § 921.141(6), and nonstatutory mitigating circumstances.

The jury recommended, by a vote of eleven to one, that both Glock and Puiatti receive the death penalty. Because Florida law does not require it to do so, the jury did not indicate the specific aggravating circumstances that formed the basis for its death penalty recommendation.[7] The trial judge adopted the sentencing recommendations of the jury and imposed the death penalty. As to both defendants, the trial judge specifically found three aggravating circumstances: that the murder was committed (1) for financial gain; (2) to avoid arrest; and (3) in a cold, calculated, and premeditated manner. The judge rejected two aggravating circumstances—that the murder was heinous, atrocious, or cruel, and that the murder was committed in the course of a kidnapping— because the facts necessary to support them comprised the basis for the judge's finding of two other aggravating circumstances.[8] In Glock's case, the judge found a statutory mitigating circumstance in Glock's lack of a prior criminal history, and three nonstatutory mitigating circumstances in Glock's cooperation in the police investigation, his capacity for rehabilitation, and his good behavior while incarcerated. In the court's view, however, those mitigating circumstances did not outweigh the three aggravating circumstances that attended the murder.

Following the imposition of sentence, Glock appealed his murder conviction and death sentence; he did not appeal his convictions for kidnapping and robbery.[9] The Florida Supreme Court found no error in the proceedings before the trial court and therefore affirmed.[10] *Puiatti v. State*, 495 So.2d

---

er the murder was "especially wicked, evil, atrocious, or cruel."

6. Prior to instructing the jury, the court held several charge conferences during which Glock (or Puiatti, joined by Glock) requested specific limiting instructions for a number of the aggravating circumstances. As to the standard for the heinous, atrocious, or cruel circumstance, Glock and Puiatti requested that the jury be instructed as follows:

> While all murders are heinous, this aggravating factor contemplates the conscienceless, pitiless, or unnecessarily torturous crime which is accompanied by such additional acts as to *set it apart from the norm of capital felonies....* , 'Atrocious' means outrageously wicked and vile. 'Cruel' means designed to inflict a high degree of pain, or with utter indifference to or even enjoyment of the suffering of others.

They based this request on the fact that the terms contained in this aggravating circumstance "have developed very narrow and specific meaning within the case law" such that the narrowing language "could be appropriate . . . to the jury to assist them and provide them some structure in reaching their verdict which is the structure provided by the law of the state." After hearing these arguments, the trial judge denied the defendants' requested instructions.

7. For a more detailed description of the Florida capital sentencing scheme, see *infra* part III(A).

8. The court declined to find the existence of the aggravating circumstance of committing a murder while engaged in the commission of, or while in flight after the commission of, a kidnapping, because the only facts in the case that could support such a finding were also necessary to support the finding that the murder was committed to avoid or prevent a lawful arrest. The court employed a similar "double counting" analysis in rejecting the atrociousness circumstance in favor of its finding that the murder was cold, calculated, and premeditated. *See White v. State*, 403 So.2d 331, 337–38 (Fla.1981), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); *Provence v. State*, 337 So.2d 783, 786 (Fla.1976) (prohibiting the application of multiple aggravating circumstances based on identical facts), *cert. denied*, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). In each instance, the court determined that it had selected the more appropriate aggravating circumstance.

9. Similarly, Glock did not challenge these two convictions in his Fla.R.Crim.P. 3.850 motion in the state trial court or in the instant habeas petition in the district court.

10. On direct appeal, Glock presented five claims of error. One claim concerned his murder conviction: that the court erred by excluding prospective jurors because they were opposed to the death penalty. The remaining claims concerned his sentence: Glock contended that the trial court had abused its discretion by failing to sever his . sentencing hearing from Puiatti's; by instructing the jurors and receiving their penalty recommendation on a Sunday; by finding the aggravating circumstance of cold, calculated, and premeditated; and by refusing to conclude that Glock's cooperation and his potential for

128 (Fla.1986) ("*Puiatti I*") (joint resolution of individual codefendants' direct appeals), *vacated in part*, 481 U.S. 1027, 107 S.Ct. 1950, 95 L.Ed.2d 523 (1987) (only as to Puiatti; Glock did not file a writ of certiorari).[11] Glock then moved the trial court for postconviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure. In his Rule 3.850 petition, Glock listed sixteen claims of trial court error, including, *inter alia*, the court's refusal to sever his case from Puiatti's (at both the guilt and penalty phases) and to charge the jury as he had requested at the conclusion of the penalty phase of his trial. *See supra* note 6. Glock also claimed that his attorney was ineffective both in the penalty phase of the trial and at the subsequent sentencing hearing before the court. The trial court, without holding an evidentiary hearing, examined and rejected each of Glock's claims, finding that some of his claims had been waived, that some had been decided against him on direct appeal and thus were not cognizable in a Rule 3.850 proceeding, and that the rest lacked merit.

The Florida Supreme Court affirmed the trial court's denial of Rule 3.850 relief. *Glock v. Dugger*, 537 So.2d 99 (Fla.1989).[12] In its opinion, the court discussed only two of the sixteen claims that Glock presented: (1) that the admission of a nontestifying codefendant's (Puiatti's) confession violated the Confrontation Clause of the Sixth Amendment as interpreted by the United States Supreme Court in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and as applied in *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), a case similar to Glock's; and (2) that Glock's attorney rendered ineffective assistance during the penalty phase of the case. The court found Glock's remaining claims patently meritless.

The Florida Supreme Court rejected Glock's *Bruton* claim, finding that the joint statement Glock and Puiatti made to the police "clearly indicates [the] reliability" of Puiatti's confession.[13] *Glock*, 537 So.2d at 102. The court also rejected Glock's ineffective assistance claim as meritless on its face. After the court handed down its decision, the Governor signed Glock's death warrant and his execution was scheduled for January 17, 1989.

On January 3, 1989, Glock, replicating the sixteen claims raised in his Rule 3.850 petition, filed the instant petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida. The district court, concluding that Glock's claims were meritless on their face and that an evidentiary hearing was unnecessary, denied the writ.[14] The court did grant a certifi-

---

rehabilitation were sufficiently mitigating to warrant a life sentence. *Puiatti v. State*, 495 So.2d, 128, 132 (Fla.1986), *vacated*, 481 U.S. 1027, 107 S.Ct. 1950, 95 L.Ed.2d 523 (1987). Glock, however, did not challenge the jury instruction for the atrociousness circumstance.

**11.** After his conviction and sentence were affirmed on direct appeal, only Puiatti petitioned the Supreme Court for a writ of certiorari. The Supreme Court granted the writ, vacated the Florida Supreme Court's judgment against Puiatti, and remanded the case to the Florida Supreme Court for reconsideration in light of *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). *See Puiatti v. Florida*, 481 U.S. 1027, 107 S.Ct. 1950, 95 L.Ed.2d 523 (1987). Glock did not seek certiorari review in the Supreme Court; thus, his conviction and sentence became final when the Supreme Court of Florida denied his petition for rehearing on October 28, 1986.

**12.** The state supreme court simultaneously denied the petition for a writ of habeas corpus that Glock had filed with the court pending the disposition of his Rule 3.850 proceeding.

**13.** In disposing of Glock's *Bruton* claim, the Florida Supreme Court reiterated the rationale it used in disposing of Puiatti's similar claim in *Puiatti v. State*, 521 So.2d 1106 (Fla.1988) ("*Puiatti II*"), *cert. denied*, 488 U.S. 871, 109 S.Ct. 184, 102 L.Ed.2d 153 (1988). In *Puiatti II*, on remand from the United States Supreme Court, the Florida Supreme Court again determined that there was no Confrontation Clause violation. Specifically, the Court found that the interlocking nature of the multiple confessions assured their reliability, such that there could be no *Bruton* violation. Finally, the court held in the alternative, that even if there was a violation of the Confrontation Clause, that violation was harmless.

**14.** Like the Florida Supreme Court, the district court found that only two claims merited any discussion: Glock's *Bruton* and ineffective assistance of counsel claims. In rejecting them, the district court also adopted the Florida Supreme Court's rationale in *Puiatti II*.

cate of probable cause, however, thereby permitting this appeal. ·

On appeal, Glock presents seven of the claims he asserted in the district court. One of the claims attacks his murder conviction; the remaining six challenge his death sentence. In Part II, we consider whether Glock is entitled to a new trial because the trial court violated his Sixth Amendment right to confront the witnesses against him by admitting the confession of his nontestifying codefendant, Puiatti.[15] Although we conclude that the trial court denied Glock his right of confrontation, we nonetheless affirm Glock's murder conviction because the denial constituted harmless error. In Part III, we examine Glock's claim that the trial court's jury instruction regarding the atrociousness circumstance was unconstitutionally vague, thus preventing the jury, and subsequently the trial judge, from making a reliable capital sentencing determination. We conclude that the instruction was unconstitutionally vague and that Glock's sentence, therefore, must be set aside. Given this conclusion, we need not examine Glock's five remaining challenges to his sentence.

## II.

### A.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant to confront the witnesses against him. U.S. Const. amend. VI.[16] Thus, in a joint trial, the Confrontation Clause prevents a party from introducing a nontestifying codefendant's statement that inculpates a defendant, because that defendant is denied the opportunity to confront, and cross-examine, the nontestifying codefendant.[17] *Cruz v. New York*, 481 U.S. 186, 189, 107 S.Ct. 1714, 1717, 95 L.Ed.2d 162 (1987) (citing *Pointer v. State*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965)). Moreover, a violation of the Confrontation Clause cannot be cured by instructing the jury to consider the statement only in assessing the guilt of the codefendant who made it. *Bruton v. United States*, 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1627–28, 20 L.Ed.2d 476 (1968) (finding that the "risk that the jury will not, or cannot, follow instructions [to disregard the nontestifying codefendant's statement] is so great, and the consequences of failure so vital to the defendant," that a limiting instruction is insufficient to insulate against the Confrontation Clause violation).

It was not until *Cruz*, however, that the Court addressed a situation similar to the case presently before us, where, in addition to the statement given by the nontestifying codefendant, the defendant made a statement of his own that corroborates the nontestifying codefendant's statement.[18] In *Cruz*, the

---

**15.** The State argues that Glock procedurally defaulted his *Bruton* claim when he failed to raise it on direct appeal from his conviction, *see supra* note 10; in fact, Glock specifically abandoned this claim in the Notice of Abandonment he filed in the Florida Supreme Court. We find that the claim is not procedurally barred, however. Although Glock did not raise his *Bruton* claim on direct appeal, he did raise it in his Rule 3.850 motion. The lower court denied Glock's *Bruton* claim, and the Florida Supreme Court affirmed on the merits. *Glock*, 537 So.2d at 102. Federal habeas review of the claim therefore is not barred. *See, e.g., Oliver v. Wainwright*, 795 F.2d 1524, 1528–29 (11th Cir.1986), *cert. denied*, 480 U.S. 921, 107 S.Ct. 1380, 94 L.Ed.2d 694 (1987).

The State argues alternatively that Glock cannot rely upon the rule laid down in *Cruz* because that rule did not come into effect until after Glock's conviction became final in October 1986; consequently, its retroactive application here is barred by the "new law" doctrine of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). It is clear, however, that in light of the Florida Supreme Court's explicit application of *Cruz* to the facts of this case, *Cruz* is the law of the case as it comes to us; thus, there can be no *Teague* bar.

**16.** The Confrontation Clause applies to the states through the Fourteenth Amendment. *Pointer v. State*, 380 U.S. 400, 403–06, 85 S.Ct. 1065, 1068–69, 13 L.Ed.2d 923 (1965).

**17.** Ordinarily, a confession is admissible at trial against the person who made it. A Confrontation Clause violation arises in the joint trial context, however, because notwithstanding the admissibility of the confession as to the nontestifying codefendant who made it ("Defendant A"), it is inadmissible against a defendant who did not participate in its making ("Defendant B") to the extent that the confession given by Defendant A implicates Defendant B.

**18.** The Court used *Cruz* as a vehicle to revisit the issue of multiple codefendant confessions first

Court held that the introduction of a defendant's own confession that corroborates, or "interlocks" with, the nontestifying codefendant's statement "might, in some cases render the violation of the Confrontation Clause harmless, but could not cause introduction of the nontestifying codefendant's confession not to constitute a violation." *Id.* 481 U.S. at 191, 107 S.Ct. at 1718 (adopting reasoning of concurring opinion in *Parker v. Randolph,* 442 U.S. 62, 77–80, 99 S.Ct. 2132, 2141–42, 60 L.Ed.2d 713 (1979) (Blackmun, J., concurring in part and concurring in judgment). Thus, in a joint trial, a nontestifying codefendant's statement, to the extent that it implicates another defendant, violates *Bruton* even though that statement "interlocks" with the statement of the implicated defendant. *Id.* The *Bruton* error is not fatal, however, if it is deemed harmless by a reviewing court.

▮ In the present case, the trial court violated the *Bruton* rule by admitting the statement of a nontestifying codefendant, Puiatti, that incriminated the defendant, Glock. Moreover, the *Bruton* violation was not avoided by either the trial judge's clear and concise instruction to the jury not to consider Puiatti's statement as evidence against Glock or by the fact that both Glock's individual statement and the joint confession of Glock and Puiatti unquestionably corroborated Puiatti's statement. Accordingly, we must review the circumstances in which the

error was made in order to determine whether that error was harmless.

**B.**

▮ Traditionally, harmless error analysis of *Bruton* violations has followed the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which came before the Court on direct review. *See Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). This well-established standard, however, is no longer applicable to harmless error examinations undertaken in a federal habeas corpus proceeding. In *Brecht v. Abrahamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993), the Supreme Court announced a "less onerous standard on habeas review of constitutional error." Under *Brecht,* the proper inquiry is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at ——, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Thus, the "habeas petitioner[ ] may obtain plenary review of [his] constitutional claims, but [he is] not entitled to habeas relief based on trial error unless . . . it resulted in 'actual prejudice.' " [19] *Id.* at ——, 113 S.Ct. at 1722.

addressed in *Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979). In *Parker,* a plurality decision, the Court was unable to resolve the question whether *Bruton* applies in a case where the defendant's confession, which is admissible against him, corroborates the nontestifying codefendant's statement. *Id.* at 77–80, 99 S.Ct. at 2141–43 (Blackmun, J., concurring in part and concurring in judgment). In his concurrence, Justice Blackmun refused to join a portion of the principal opinion because "it abandons the harmless error analysis the Court previously has applied in similar circumstances and now adopts a *per se* rule to the effect that *Bruton* is inapplicable in an interlocking confession situation." *Id.* at 77, 99 S.Ct. at 2141.

**19.** Petitioner seeks to avoid application of the *Brecht* standard by characterizing the error not as an error at trial, but rather as a structural defect occasioned by the trial court's refusal to sever the proceedings against Glock and Puiatti. "Trial error 'occur[s] during the presentation of

the case to the jury,' and is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].' " *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991)). In contrast, a "structural defect" involves an error that is so fundamental as to affect the very "framework within which the trial proceeds," thus requiring outright reversal as opposed to harmless error analysis. *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265. Examples of such error include the denial of counsel or of an impartial judge. Although Glock's severance claim may appear at first glance to present a structural defect, it is clear upon closer scrutiny that the claim is based almost entirely upon the prejudice associated with the introduction of Puiatti's confession and thus cannot be said to create a structural defect in the trial procedure. As such, the error, properly

■ The *Bruton* violation in this case had no substantial and injurious effect on the jury's verdict.[20] Here, unlike in *Cruz*, the defendant suffering the constitutional deprivation never contested the probative value of any of the three confessions introduced at

trial.[21] On the contrary, both Glock and Puiatti admitted at trial and while giving their confessions that their statements were truthful, voluntary, and freely-given. As such, the interlocking nature of the three confessions, two of which were directly admissible against Glock,[22] "may be considered

assessed as a violation of the *Bruton* rule, is nothing more than a trial error to which *Brecht* clearly applies.

We similarly reject the remaining grounds for Glock's argument that severance was necessary to avoid a structural error at the guilt phase. In addition to the *Bruton* violation, Glock's claim for severance was based upon the possibility of: (1) antagonistic defenses; (2) one defendant testifying and thereby calling attention to the other defendant's decision not to testify; and (3) juror inability to give proper consideration to each defendants' case. A thorough review of the transcript of the guilt phase of the trial, however, reveals that none of the concerns raised by Glock came to pass. The two defenses were virtually identical, neither Glock nor Puiatti testified at the guilt phase, and there was no indication of juror confusion caused by the trial court's decision to try the defendants jointly. Accordingly, we reject Glock's claim that the trial court's failure to sever the guilt phase of his trial constituted a structural error.

20. A recent opinion of this court has held that the state bears the burden of proving, under *Brecht*, that a trial error was not prejudicial. *Bonner v. Holt*, 26 F.3d 1081 (11th Cir.1994). The Supreme Court recently has granted certiorari on the burden of proof issue, *O'Neal v. Morris*, 3 F.3d 143 (6th Cir.1993) (holding that the petitioner bears the burden of proof under *Brecht*), *cert. granted*, —— U.S. ——, 114 S.Ct. 1396, 128 L.Ed.2d 70 (1994). Because the outcome in this case would be the same regardless of who bears the burden of proving or disproving actual prejudice, we need not await the Supreme Court's resolution of this issue before disposing of Glock's Confrontation Clause claim.

21. In *Cruz*, two brothers, Eulogio and Benjamin, were tried jointly for the murder of a gas station attendant; moreover, both allegedly had confessed to their involvement in the murder to a third party (the brother of the victim) who testified to that effect at trial. *Cruz*, 481 U.S. at 188–89, 107 S.Ct. at 1716–17. The testimony of the third-party witness was admissible against both Eulogio and Benjamin. At trial, the state also introduced a confession that Benjamin had given to the police in which he implicated both himself and Eulogio. *Id.* at 189, 107 S.Ct. at 1717. Because Benjamin did not testify at trial, his confession was inadmissible as evidence against Eulogio; accordingly, the trial judge instructed the jury not to consider Benjamin's testimony as evidence against Eulogio. As part of his defense, Eulogio attempted to persuade the jury that the third-party witness believed that Eulogio and Benjamin had murdered his brother, and that the

witness therefore had fabricated his testimony in order to exact revenge against them.

The court of appeals, in reviewing Eulogio's *Bruton* claim, determined that the admission of Benjamin's confession constituted harmless error because Eulogio's own confession to the third-party witness corroborated the confession given by Benjamin.

In rejecting the court of appeals' analysis of the Confrontation Clause violation, the Supreme Court first held that, regardless of the potentially interlocking nature of the two confessions, the admission of Benjamin's confession violated *Bruton*, such that the only question remaining was whether admission of that confession amounted to harmless error. The Court then held that, although the interlocking nature of two confessions (here, the fact that the joint confession and Benjamin's confession were substantially similar) may not be relied upon to avoid the application of *Bruton*, it generally may be considered in evaluating whether a *Bruton* violation was harmless. *Id.* 481 U.S. at 193–94, 107 S.Ct. at 1719. In cases such as Eulogio's, where the defendant contests the veracity of his own allegedly corroborative confession, moreover, the Court stated that admission of a confession of a nontestifying codefendant that violates *Bruton* (here, Benjamin's confession) could not be treated as harmless, absent a finding that the defendant's corroborating confession (Eulogio's) was in fact genuine. Because the record could not support such a finding in Eulogio's case, the Court reversed and remanded for additional findings.

22. Glock also maintains that a Confrontation Clause violation attaches to Puiatti's statements in the joint confession because, although he was present at the giving of the confession, his silence cannot be construed as an adoption of Puiatti's statements. While it is true that a defendant is under no duty to speak and that his mere silent presence during a codefendant's confession cannot be viewed as an adoption of that codefendant's statement as his own, such facts are not present here. *See Hall v. Wainwright*, 559 F.2d 964, 965 n. 4 (5th Cir.1977), *cert. denied*, 434 U.S. 1076, 98 S.Ct. 1266, 55 L.Ed.2d 782 (1978). In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the Former Fifth Circuit handed down prior to October 1, 1981.

Here, Glock actively participated in the giving of a truly *joint* confession. In addition to making frequent interjections during Puiatti's account of the events of the day in question, Glock contrib-

on appeal in assessing whether any Confrontation Clause violation was harmless." *Cruz*, 481 U.S. at 194, 107 S.Ct. at 1719; *see also id.* at 192, 107 S.Ct. at 1718 (noting that a *Bruton* violation may be harmless if "the defendant were *standing by* his confession, in which case it could be said that the codefendant's confession does no more than support the defendant's very own case"). Thus, because Glock is "standing by" his confessions, and because those confessions substantially corroborate the statements in Puiatti's confession that incriminate Glock, the interlocking nature of the multiple confessions supports a finding that, with respect to the substance of Puiatti's statement, the *Bruton* violation caused by the admission of Puiatti's statement was harmless error.

A review of the trial transcript confirms our view that the admission of Puiatti's statement, this time with respect to the procedural aspects of the statement's admission, was harmless error. Initially, the individual taped statements of Puiatti and Glock that were played to the jury were virtually identical in duration. Also, the taped statements were played to the jury in immediate succession, with Glock's being played first, such that neither statement was accorded undue influence before the jury. Additionally, aside from the actual playing of the tape, Puiatti's confession was never again brought to the attention of the jury, either during the examination of witnesses or in the closing arguments of counsel.[23] Finally, although counsel for Glock and Puiatti frequently objected to the court's admission of the statements and to the court's refusal to sever their cases, all of their objections were made at side bar, and thus did not draw the jury's attention to the statements or result in any prejudice or harm.

Accordingly, based on the record taken as a whole, we find that the improper admission of Puiatti's individual statement was harmless error that did not substantially affect the jury's verdict. In his individual statement and in the joint confession, Glock corroborated the damaging portions of Puiatti's statement by admitting to having been at the scene of the crime and to having participated in the murder both by agreeing to kill the victim and by actually firing shots into the victim. Moreover, the trial transcript reveals no instances in which Puiatti's individual confession was used in an overly prejudicial or damaging fashion. In fine, the *Bruton* violation constituted harmless error, and Glock's conviction for first degree murder is affirmed.

## III.

In his habeas petition, Glock presented a number of challenges to his sentence of death.[24] Because we find that the trial

uted much of the narrative that directly concerned the events of the shooting. He described the first shots fired by Puiatti; he admitted to having actually fired two shots, including the one that ultimately felled the victim; and he stated that it was he who first noticed that the victim was still standing after she was shot the first time. Finally, at the conclusion of the joint statement, Glock stated that he had been treated fairly by the police and that he was in full agreement with the entire description of the event. Moreover, Glock has never contended, either at trial or subsequently, that the joint statement was involuntary. As such, Glock's claim that he was a mere silent witness at the joint confession is contrary to the full weight of the evidence indicating that he actively participated in making, and subsequently adopted, the statement. Accordingly, the entire joint confession was admissible against Glock, thus precluding a Confrontation Clause violation.

23. The only discernible reference to Puiatti's statement before the jury came during Puiatti's closing argument. In an attempt to demonstrate

that Puiatti's involvement in the murder was not premeditated and that Glock's constant banter caused Puiatti to "snap" momentarily, Puiatti's counsel cited, over the prosecution's objection, a portion of Puiatti's individual confession where Puiatti stated "I don't want to, I don't want to." Even according this reference to Puiatti's statement its full potential prejudicial effect in Glock's case, it is impossible to say that the statement had a substantial and injurious effect or influence upon the jury's verdict.

24. Glock raises seven challenges to his death sentence on appeal. Glock interposes one claim against his trial counsel: that the assistance rendered during the penalty phase of the proceedings was ineffective. The remainder of Glock's claims assert errors by the trial court: (1) failing to sever Glock's and Puiatti's sentencing hearing based, *inter alia*, on the admission of codefendant Puiatti's individual confession; (2) issuing constitutionally deficient jury instructions on aggravating and mitigating circumstances, and thus failing to channel the jury's discretion; (3) un-

court's instruction to the jury with respect to the heinous, atrocious, or cruel aggravating circumstance was constitutionally deficient, we vacate Glock's death sentence, rendering unnecessary an examination of his remaining claims of error regarding the sentencing phase of his trial.

### A.

Under the Florida capital sentencing scheme, a defendant found guilty of capital murder receives a separate hearing to determine whether the appropriate penalty for his crime is life imprisonment or death. Fla. Stat.Ann. § 921.141(1) (West 1985 & Supp. 1994). The hearing, typically conducted before the same jury that heard the evidence at the guilt phase, entails the presentation of aggravating evidence by the prosecutor and mitigating evidence by the defendant. After the presentation of evidence and the arguments of counsel, the judge instructs the jury to consider whether certain statutorily enumerated aggravating circumstances exist in the case, and if so, whether those aggravating circumstances are outweighed by any mitigating circumstances that may be present. Fla.Stat.Ann. § 921.141(2). While there are a number of statutorily defined mitigating circumstances, the jury is instructed that it may consider any evidence that mitigates in favor of a life sentence.

 Upon being charged, the jury, by majority vote, renders an advisory verdict of either death or life imprisonment.[25] Notwithstanding the recommendation of the jury, however, the trial court, in a subsequent sentencing proceeding, independently weighs the aggravating and mitigating circumstances and renders the final determination as to life or death. Fla.Stat.Ann. § 921.141(3). In arriving at its sentence, the court is required to place "great weight" upon the recommendation of the jury. *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975). As such, the jury's recommendation, be it a recommendation of life imprisonment or death, constitutes an important factor that must be incorporated into the judge's independent weighing process. *Mann v. Dugger*, 844 F.2d 1446, 1454 (11th Cir.1988) (en banc) ("The case law reflects an interpretation of the death penalty statute that requires the trial court to give significant weight to the jury's recommendation, whether it be a recommendation of life imprisonment or a recommendation of death."), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989).

 These well-established procedural rules recently led the Supreme Court to observe that, under the Florida capital sentencing scheme, the judge and jury are "co-sentencers." *Espinosa v. Florida*, —— U.S. ——, ——, 112 S.Ct. 2926, 2929, 120 L.Ed.2d 854 (1992). Moreover, the Court concluded that, where the state "decides to place capital-sentencing authority in two actors rather than one, neither actor must be permitted to weigh invalid aggravating circumstances." *Id.* See also *Sochor v. Florida*, 504 U.S. ——, ——, 112 S.Ct. 2114, 2119, 119 L.Ed.2d 326 (1992) (holding that a sentencer weighing "invalid" aggravating circumstance violates the Eighth Amendment); *Stringer v. Black*, 503 U.S. ——, ——, 112 S.Ct. 1130, 1140, 117

---

constitutionally shifting to Glock (in the jury instructions) the burden of proving that death was an inappropriate penalty for his crime; (4) unconstitutionally diluting the jury's sense of responsibility; (5) failing to find (in its sentencing order) the presence of nonstatutory mitigating circumstances; and (6) sentencing Glock and Puiatti in a joint order, thereby failing to provide Glock with an individualized and reliable capital sentencing determination.

Additionally, Glock challenges the district court's failure to hold an evidentiary hearing on several of his claims. Glock is not entitled to an evidentiary hearing, however, because he has not "allege[d] facts that, if proved at the hearing, would entitle [him] to relief." *Meeks v. Single-*

---

*tary*, 963 F.2d 316, 319 (11th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993). With the possible exception of his claim that his attorney's performance was ineffective at the sentencing phase of the trial, Glock's claims presented only issues of law; an evidentiary hearing therefore would not have aided the disposition of those claims. In addition, our decision to vacate Glock's sentence obviates the need to determine whether the district court should have held a hearing on Glock's ineffective assistance of counsel claim.

**25.** As we have noted, the jury, in recommending the death penalty, does not make specific findings regarding the existence of individual aggravating or mitigating circumstances.

L.Ed.2d 367 (1992) (holding that use of vague or imprecise aggravating circumstance invalidates death sentence); *Clemons v. Mississippi*, 494 U.S. 738, 752, 110 S.Ct. 1441, 1450, 108 L.Ed.2d 725 (1990) (same).[26]

## B.

■ In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny, the Supreme Court interpreted the Eighth Amendment to require that the discretion of a capital sentencer be channelled and limited so as to minimize the risk of wholly arbitrary and capricious action. *See Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988). Thus, to the extent that an aggravating circumstance, as defined in the death penalty statute, provides insufficient guidance, it must be accompanied by narrowing language that provides a "principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia*, 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980).

In a long line of cases, beginning with *Godfrey*, the Supreme Court established conclusively that instructions that do little more than recite the words of the statute, "heinous," "atrocious," and "cruel," must be accompanied by language that effectively narrows the sentencer's discretion. *Stringer*,

503 U.S. at ——, 112 S.Ct. at 1135. *See also Godfrey*, 446 U.S. at 428–29, 100 S.Ct. at 1764–65 (invalidating death sentence based on aggravating circumstance that the killing was "outrageously or wantonly vile, horrible and inhuman"); *Maynard*, 486 U.S. at 359, 108 S.Ct. at 1856 (same result as to language that killing was "especially heinous, atrocious, or cruel"); *Espinosa*, —— U.S. at ——, 112 S.Ct. at 2927 (same as to "especially wicked, evil, atrocious, or cruel").

The Supreme Court of Florida has provided additional language designed to channel the sentencer's discretion with respect to the atrociousness circumstance used in the statute:

> that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

*State v. Dixon*, 283 So.2d 1, 9 (Fla.1973), *cert. denied*, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The United States Supreme Court has found Florida's narrowing construction for the atrociousness circum-

---

**26.** Florida argues that the trial court was not required to provide a constitutionally adequate instruction to the jury because "[i]t cannot be said that prior precedent dictated or compelled the *Espinosa* determination that in Florida the jury is a co-sentencer or that Florida has 'essentially split the weighing process in two.'" While it is true, under *Teague*, that except under certain limited circumstances, a habeas petitioner such as Glock may not obtain relief in a federal court by reliance on a new rule of law, that situation is not presented here because *Espinosa* does not announce a new rule of law. According to *Teague*, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original). *See also Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (applying *Teague* retroactivity analysis to capital cases).

In *Espinosa*, the Supreme Court made clear that its determination that the judge and jury are

cosentencers under the Florida scheme was based on principles of Florida law that were established long before Glock's sentence became final. *Espinosa*, —— U.S. at ——, 112 S.Ct. at 2928 ("Our examination of Florida case law indicates, however, that a Florida trial court is required to pay deference to a jury's sentencing recommendation, in that the trial court must give 'great weight' to the jury's recommendation.... Thus, Florida has essentially split the weighing process in two.") (citations omitted). Specifically, the Court recognized that since 1975, when the Florida Supreme Court decided *Tedder v. State*, the trial judge, in arriving at his final capital sentencing determination, has been required to place "great weight" on the jury's recommendation. *Id.* Accordingly, we find that *Espinosa* involves nothing more than a straightforward application of Florida law that was in existence long before Glock's sentence became final.

stance to be constitutional, *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976); *Sochor v. Florida*, —— U.S. ——, —— – ——, 112 S.Ct. 2114, 2121–22, 119 L.Ed.2d 326 (1992), making clear in the process that the portion of the *Dixon* language necessary to meet constitutional scrutiny is the statement that the atrociousness circumstance applies only to a " 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.' " *Id.* at ——, 112 S.Ct. at 2121 (quoting *Dixon*, 283 So.2d at 9).

### C.

█ In this case, Glock's death sentence must be vacated because one of parties charged with determining his sentence, the jury, weighed an unconstitutionally vague aggravating circumstance. At the close of the sentencing hearing, the court instructed the jury with the language rejected by the Supreme Court in *Espinosa*: [27] whether the crime for which the defendant was to be sentenced was "especially wicked, evil, atrocious, or cruel." The jury was not provided any narrowing instructions.

The trial judge believed it was unnecessary to instruct the jury with the narrowing language in *Dixon* because, under Florida law, capital sentencing juries are not required to make specific findings as to the presence of aggravating and mitigating circumstances. In other words, the judge erroneously believed either that he was the sole sentencer under the Florida scheme or that his own final and independent sentencing determination could cure any defect with respect to the jury's sentencing determination. Indeed, in his specific findings, the trial judge refused to apply the atrociousness circumstance in reaching Glock's sentence.

█ Under the Florida capital sentencing scheme, however, neither the fact that the trial judge did not apply the atrociousness circumstance nor the presumption that the judge independently applied the Florida Su-

preme Court's narrowing language in arriving at Glock's sentence can cure the constitutional error in failing to give the jury an appropriate limiting instruction on the atrociousness circumstance. As stated above, Florida has adopted a capital sentencing plan in which the sentencing recommendation of the jury is inextricably linked to the sentencing determination made by the trial judge, such that neither the judge nor the jury may be permitted to consider an invalid aggravating circumstance. Because the trial judge must accord great weight to the jury's sentencing recommendation, the jury's recommendation of death in this case, tainted as it was by the inadequate instruction on the atrociousness circumstance, necessarily tainted the trial judge's final decision. Accordingly, Glock's sentence cannot stand; he must be afforded another sentencing proceeding in which the jury is given instructions that fully comport with the Constitution.

### IV.

In conclusion, we AFFIRM the district court's denial of the writ of habeas corpus with respect to Glock's conviction for first degree murder. We REVERSE, however, the district court's denial of the writ as to Glock's claim that the jury instruction on the heinous, atrocious, or cruel aggravating circumstance was constitutionally invalid. The case is REMANDED to the district court with instructions to issue the writ setting aside Glock's death sentence unless the State provides him with a new sentencing proceeding before a newly empaneled jury.

IT IS SO ORDERED.

█

---

**27.** The Supreme Court has determined dispositively in cases such as *Espinosa, Maynard,* and *Clemons* that jury instructions for the atrociousness circumstance that do not include narrowing language are unconstitutionally vague; these cases were foreordained by *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and thus do not announce a new rule of law. *Stringer v. Black,* —— U.S. ——, ——, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992). Accordingly, we need not conduct an extensive *Teague* inquiry with respect to this point.