[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/10/99
THOMAS K. KAHN
CLERK

No. 98-3425

D. C. Docket No. 89-00054-CIV-T-17

ROBERT DEWEY GLOCK,

Petitioner-Appellant,

versus

MICHAEL W. MOORE,

Respondent-Appellee.

Appeal from the United States District Court
for the Middle District of Florida

**(November 10, 1999)**

Before ANDERSON, Chief Judge, TJOFLAT and BLACK, Circuit Judges.

TJOFLAT, Circuit Judge:

Petitioner Robert Glock appeals the district court's denial of the writ of habeas corpus with respect to his sentence of death. Petitioner argues that he was denied constitutionally effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments, during the penalty phase of his trial. The district court denied the writ and we now affirm in all respects.

## I.

### A.

Glock and his codefendant, Carl Puiatti, were charged in Florida with the first-degree murder, kidnapping, and robbery of Sharilyn Ritchie. The Florida Supreme Court described the evidence against Glock as follows:

> [O]n August 16, 1983, the woman victim arrived at a Bradenton shopping mall. As she exited her automobile, Puiatti and Glock confronted her, forced her back inside the car, and drove away with her. They took $50 from her purse and coerced her into cashing a $100 check at her bank. They then took the victim to an orange grove outside Dade City[,] where they took the woman's wedding ring and abandoned her at the roadside. After traveling a short distance, the appellants determined that the woman should be killed, and they returned in the car to her. When the car's window came adjacent to the woman, Puiatti shot her twice. The appellants drove away, but, when they saw she was still standing, they drove by the victim again and Glock shot her. When the woman did not fall, the appellants made a third pass with the automobile, Glock shot her another time, and the woman collapsed.

Puiatti v. State, 495 So. 2d 128, 129 (Fla. 1986), vacated in part, 481 U.S. 1027, 107 S. Ct. 1950, 95 L. Ed. 2d 523 (1987).

The facts surrounding Glock's arrest and trial have been developed extensively in Glock v. Singletary, 36 F.3d 1014, 1017-18 (11th Cir. 1994), vacated, 51 F.3d 942 (11th Cir. 1995) (en banc), and Glock v. Singletary, 65 F.3d 878, 880-81 (11th Cir. 1995) (en banc). Glock was found guilty of all three offenses. At the penalty phase[1] Glock presented three witnesses, and also testified himself. Willie May Glock,

---

[1] Under the Florida capital sentencing scheme, a defendant found guilty of capital murder receives a separate hearing to determine whether the appropriate penalty for his crime is life imprisonment or death. Fla. Stat. Ann. § 921.141(1) (West 1996). The hearing, typically conducted before the same jury that heard the evidence at the guilt phase, entails the presentation of aggravating evidence by the prosecutor and mitigating evidence by the defendant. After the presentation of evidence and the arguments of counsel, the judge instructs the jury to consider whether certain statutorily enumerated aggravating circumstances exist in the case, and if so, whether those aggravating circumstances are outweighed by any mitigating circumstances that may be present. Fla. Stat. Ann. § 921.141(2). While there are a number of statutorily defined mitigating circumstances, the jury is instructed that it may consider any evidence that mitigates in favor of a life sentence.

Upon being charged by the court, the jury, by majority vote, renders an advisory verdict of either death or life imprisonment. Notwithstanding the recommendation of the jury, however, the trial court in a subsequent sentencing proceeding independently weighs the aggravating and mitigating circumstances and renders the final determination as to life or death. Fla. Stat. Ann. § 921.141(3). In arriving at its sentence, the court is required to place "great weight" upon the recommendation by the jury. Tedder v. State, 322 So. 2d 908, 910 (Fla. 1975). As such, the jury's recommendation, be it a recommendation of life imprisonment or death, constitutes an important factor that must be incorporated into the judge's independent weighing process. Mann v. Dugger, 844 F.2d 1446, 1454 (11th Cir. 1988) (en banc).

Glock's stepmother with whom he lived since the age of fourteen, testified that Glock regretted participating in the murder of Sharilyn Ritchie; that he was more of a follower than a leader, and thus she doubted that his participation in the crime was voluntary; that she loved Glock; and that his early childhood was characterized by a lack of parental guidance.[2] Dr. Gerald Mussenden, a clinical psychologist, testified that he had performed a battery of evaluative tests on Glock.[3] From these tests, Dr.

---

[2] Willie May Glock testified,
[h]e has never had anyone to take care of him. He has never had a mother or anybody to love him or care for him. He never had anyone to discipline or teach him right from wrong, and I tried as a mother just like I did my four children to brush your teeth and take a bath before you go to school. Bobby couldn't understand this. He was fourteen. He felt like he had a mind of his own – he had to take care of hisself [sic] ever since he was eight years old.
. . . .
Bobby has had to survive any way he could ever since he was eight years old. He had no mother or father. He's had to survive the best way he knew how.
. . . .
Put yourself in Bobby's place with no mother, no father, no one to turn to, no aunts, no uncles, no sisters, no brothers, nobody. How would you survive in the world alone?

[3] Dr. Mussenden described the testing as follows:
I used my structured interview to get background information so I can better understand the individual I'm seeing. I use my intelligence [test] to determine what kind of intelligence I'm dealing with so I have a better understanding of what the tests are doing. I use achievement tests to determine the literacy level to tell us identification for adjustment at this time . . . . I use the Rorschach as a way of trying to determine if there's some problems or the absence of problems. I use the Thematic

Mussenden concluded that Glock had difficulty relating to authority; special difficulties relating to women; suffered from a poor self-concept; was easily led by people who could make him feel comfortable; experienced rejection by his parents and stepparents as a child;[4] did not have a criminal personality; and was a good candidate

Apperception Test to try and evaluate some socialization abilities. I use the draw-a-person to also have information regarding the individual's perception of himself and his environment. I use the Metro Content Questionnaire to have a better understanding of how he feels about himself and how he sees himself and others, how he perceives his background, his history, his presence and his future. I use the Bi-Polo Psychological Inventory to evaluate the different areas of personality; also to try and determine if an individual has criminal tendencies and to what extent. Basically, when I'm done I have a good feeling for one's over-all development and can make some statement regarding their rehabilitation potential.

[4] Dr. Mussenden testified,
the records would indicate that he was extremely disruptive, that his mother could not handle him. It appeared that there were many problems. I am a child specialist and evaluate children and understand dynamics of behavior. Any time you have a child who is three, four, five, six, seven, eight years of age and they're pretty disruptive, it's pretty certain that the problem lies with the parents. A child isn't born bad, he's shaped that way. If he's criticized he's going to be very negative about himself. If he's constantly shamed, he's going to feel very guilty. He needs to act those feelings out somehow.

Robert had been a negative problem. Obviously, he was feeling criticized, rejected and certainly he felt that he had failed as a child. I think the most injury came when he was placed in an [orphanage at the age of twelve]. The institution may have been clean, it may have been neat, it may have been warm, it may have given him all the niceties that one would need, but they didn't give him parents. Any child would prefer to be with their parents, no matter how dismal the conditions. But

5

for rehabilitation. Tammy Yonce, Glock's sister with whom he lived until age thirteen, testified that Glock was a follower; that he regretted his participation in the murder of Sharilyn Ritchie; that she loved him; and that Glock's early childhood was characterized by extensive physical and emotional abuse from his alcoholic mother.[5]

_____

> to be placed in an institution, to be moved is the ultimate rejection, and failure for any child to experience. That certainly was a trauma that could not be undone unless the parents are willing to try and work it through.
>
> He had been returned, within a year or so, and was sent to live with his father – a second rejection, a second failure, a second traumatic experience. He lived with the father – that didn't work out very well, either, additional failure. Um, additional feelings of conflict and certainly additional feelings of lack of self-importance, feeling better about himself.

[5] Glock lived with his mother, Carol Harmon, and stepfather, Wyman Harmon, in Columbia, South Carolina, until he reached the age of thirteen when he was moved to the Epworth Children's Home in Columbia, South Carolina. Yonce testified that

> [the children's] mother has always been an alcoholic, a committed alcoholic, although she does not admit it. We were physically and mentally abused as children until the age of approximately thirteen years old when I no longer saw Bobby because the Court took him out of the home, took him away from the home and put him in Epworth.
> . . . .
> We were beat constantly – almost daily for simple things. If we were ten minutes late coming home from school, we were beat. If there was dirty dishes in the house, we were beat. My mother would always call my brother names. She did not approve of who he was. She did not like him because of who his father was. She more mentally abused Bobby than she did physically.
> . . . .
> She called him a bastard and a son of a bitch every day. She would constantly say that he was not worth anything – he was just like his

6

Finally, Glock, himself, took the stand and testified that he felt much remorse and

sorrow about his participation in the murder.

In his closing argument during the penalty phase, Glock's attorney, Robert

Trogolo, argued against the finding of any statutory aggravating circumstances.[6] He

_____

father, that he was stupid and ignorant and she could not believe that he
was like he was. This was daily. I would hear this all the time.

[6] While a Florida trial court may consider any mitigating circumstances,
statutory and nonstatutory, when making its determination of life or death,
aggravating circumstances are limited to those that are statutorily defined. The
aggravating circumstances that may be considered by the court at the time of
sentencing are:

(a) The capital felony was committed by a person under sentence of
imprisonment or placed on community control.
(b) The defendant was previously convicted of another capital felony or
of a felony involving the use or threat of violence to the person.
(c) The defendant knowingly created a great risk of death to many
persons.
(d) The capital felony was committed while the defendant was engaged,
or was an accomplice, in the commission of, or an attempt to commit, or
flight after committing or attempting to commit, any robbery, sexual
battery, aggravated child abuse, arson, burglary, kidnapping, or aircraft
piracy or the unlawful throwing, placing, or discharging of a destructive
device or bomb.
(e) The capital felony was committed for the purpose of avoiding or
preventing a lawful arrest or effecting an escape from custody.
(f) The capital felony was committed for pecuniary gain.
(g) The capital felony was committed to disrupt or hinder the lawful
exercise of any governmental function or the enforcement of laws.
(h) The capital felony was especially heinous, atrocious, or cruel.
(i) The capital felony was a homicide and was committed in a cold,
calculated, and premeditated manner without any pretense of moral or
legal justification.

also argued that there were several mitigating circumstances that weighed against the imposition of the death penalty. As for statutory mitigating circumstances, Trogolo argued that Glock had no significant history of prior criminal activity; the felony was committed while Glock was under the influence of extreme mental or emotional disturbance; Glock acted under the substantial domination of another person (his codefendant, Puiatti); Glock's capacity to conform his conduct to the requirements of law was substantially impaired; and that while Glock was chronologically twenty-two years of age, his emotional or psychological age was much younger, and thus the "age of the defendant" should be considered in his favor. See Fla. Stat. Ann. § 921.141(6).[7]

---

(j) The victim of the capital felony was a law enforcement officer engaged in the performance of his official duties.
(k) The victim of the capital felony was an elected or appointed public official engaged in the performace of his official duties if the motive for the capital felony was related, in whole or in part, to the victim's official capacity.
(l) The victim of the capital felony was a person less than 12 years of age.

Fla. Stat. Ann. § 921.141(5).

[7] The only statutory mitigating factors that Trogolo did not argue for were (a) "[t]he victim was a participant in the defendant's conduct or consented to the act;" and (b) "[t]he defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor."

As for nonstatutory mitigators, Trogolo argued that Glock's history of childhood abuse should be weighed in his favor. He also contended that Glock was an excellent candidate for rehabilitation. To support this claim, Trogolo argued that during the early stages of the police investigation, Glock acknowledged his wrongdoing; Glock's conduct while incarcerated had been exemplary; Glock had a history of nonviolence; Glock could adjust to law-abiding behavior; he had served honorably in the military; he was a person of good character, as testified to by his stepmother and his sister; his criminal conduct was the result of circumstances that were unlikely to recur; and Glock's attitude was one of penitence and contrition. In addition, Trogolo argued that the testimony of Willie Mae Glock and Tammy Yonce was evidence that Glock now had a stable and loving family network that could assist him in adjusting to law-abiding behavior. He stated to the jury, "[a]s Mrs. Yonce said and Willie Mae Glock, they both still love Robert." Trogolo then asked the jury to "[k]eep [Glock] where his family can still love him. They can love him in prison."

By a vote of eleven to one, the jury recommended that Glock be put to death. Because the Florida capital sentencing scheme does not require it do so, see Fla. Stat. Ann. § 921.141(2), the jury did not advise the court on which aggravating and mitigating circumstances it found were established during the trial. The court accepted the jury's recommendation and imposed the death penalty, finding as to

9

Glock that three statutory aggravating circumstances and one statutory mitigating circumstance had been established. The court found that the capital felony was committed for the purpose of avoiding a lawful arrest, or effecting an escape from custody; it was committed for pecuniary gain; and that the capital felony was a homicide and that it was committed in a cold, calculated, and premeditated manner, without any pretext of moral or legal justification. See Fla. Stat. Ann. § 921.141(5)(e), (f), (i). The court also found that Glock had established a mitigating circumstance in that he had no significant history of prior criminal activity. See Fla. Stat. Ann. § 921.141(6)(a). In its written findings, the court specifically found that Glock had not established that he "was under the influence of extreme mental or emotional disurbance" when he committed the crime, Fla. Stat. Ann. § 921.141(6)(b), because "there was no credible evidence whatsoever to support a finding that either of these defendants suffered from any disrubance [sic] that would mitigate a calculated, premeditated murder." Further, the court specifically found that Glock had not established that he was under the "substantial domination of another person" when he committed the crime. Fla. Stat. Ann. § 921.141(6)(e).

B.

Following the imposition of sentence, Glock appealed his murder conviction and death sentence. The Florida Supreme Court found no error in the proceedings before the trial court and therefore affirmed.[8] Puiatti, 495 So. 2d 128. Glock then moved the trial court for postconviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure. In his Rule 3.850 petition Glock listed sixteen claims, including a claim that his attorney was ineffective at both the guilt and penalty phases of his trial.[9] The trial court, without holding an evidentiary hearing, examined and rejected each of Glock's claims, finding that some of his claims had been waived, some had been decided against him on direct appeal and thus were not cognizable in a Rule 3.850 proceeding, and the rest lacked merit.

---

[8] On direct appeal, Glock presented five claims of error. One claim concerned his murder conviction: that the court erred by excluding prospective jurors because they were opposed to the death penalty. The remaining claims concerned his sentence: Glock contended that the trial court had abused its discretion by failing to sever his sentencing hearing from his codefendant Puiatti's; by instructing the jurors and receiving their penalty recommendation on a Sunday; by finding the aggravating circumstance of cold, calculated, and premeditated; and by refusing to conclude that Glock's cooperation and his potential for rehabilitation were sufficiently mitigating to warrant a life sentence. Puiatti, 495 So. 2d at 132.

[9] Glock's other claims for relief can be found at Glock v. Dugger, 537 So. 2d 99, 101 (Fla. 1989).

11

The Florida Supreme Court affirmed the trial court's denial of Rule 3.850 relief. Glock v. Dugger, 537 So. 2d 99 (Fla. 1989).[10] In its opinion, the court discussed only two of the sixteen claims that Glock presented: (1) that the admission of a nontestifying codefendant's (Puiatti's) confession violated the Confrontation Clause of the Sixth Amendment as interpreted by the United States Supreme Court in Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), and as applied in Cruz v. New York, 481 U.S. 186, 107 S. Ct. 1714, 95 L. Ed. 2d 162 (1987); and (2) that Glock's attorney rendered ineffective assistance because he failed to obtain additional information from Glock's family to aid the mental health experts in showing the deficiencies in Glock's personality which affected Glock's confession and presentation of evidence during the penalty phase. The court found Glock's remaining claims to be patently meritless.

The Florida Supreme Court rejected Glock's Cruz claim. Glock, 537 So. 2d at 102. The court also found the ineffective assistance claim to be without merit because "[t]he 'additional information' Glock now seeks to submit is not new, but cumulative to that which was presented in the sentencing process. In addition to the reports provided to the experts, Glock's stepmother and sister testified to the substance of his

---

[10] The court simultaneously denied the petition for a writ of habeas corpus that Glock had filed with the court pending the disposition of his Rule 3.850 proceeding.

family background." Id. After the court handed down its decision, the Governor signed Glock's death warrant and his execution was scheduled for January 17, 1989.

On January 3, 1989, Glock, replicating the sixteen claims raised in his Rule 3.850 petition, filed the instant petition for a writ of habeas corpus in the United States District Court for the Middle District of Florida. The district court concluded that Glock's claims, including his ineffective assistance claim, were meritless on their face and therefore denied the writ. Glock v. Dugger, 752 F. Supp. 1027, 1031 (M.D. Fla. 1990). The court did grant a certificate of probable cause, however, thereby permitting an appeal.

On appeal, Glock raised seven of the claims he asserted in the district court, including (1) the Cruz claim; (2) the ineffective assistance claim; and (3) that the trial court erred in refusing to provide the instruction necessary to guide the jury during the penalty phase in assessing the aggravating factors. With regard to the first of these claims, a panel of this court concluded that under Cruz, the trial court denied Glock his Sixth Amendment right to confront the witnesses against him by admitting the confession of his nontestifying codefendant, Puiatti. The panel nonetheless affirmed Glock's murder conviction because the denial constituted harmless error. As to Glock's sentence, the court found it unnecessary to consider Glock's ineffective

13

assistance claim because it granted relief from the sentence based upon another of Glock's claims. The panel found that the trial court's jury instructions regarding one aggravating factor (that "[t]he capital felony was especially heinous, atrocious, or cruel") were unconstitutionally vague, in violation of Glock's Eight Amendment rights as interpreted in Espinosa v. Florida, 505 U.S. 1079, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992). Glock, 36 F.3d at 1025. The en banc court decided to review the case to consider whether the nonretroactivity principle of Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 3234 (1989), precluded relief under either Espinosa or Cruz. Concluding that Teague barred the retroactive application of Espinosa, and that Glock merited no relief on the Cruz claim in any event, the en banc court affirmed the district court's denial of relief from the conviction and the denial of relief from the sentence based on the Espinosa claim. The court remanded the case to the panel for consideration of Glock's other challenges to his sentence. Glock, 65 F.3d at 891.

On remand, the panel found meritless all of Glock's claims, except his claim to ineffective assistance because of his counsel's failure to discover through routine investigation mitigating evidence that could have been presented during the penalty phase of the trial.[11] The court remanded the case to the district court for an evidentiary

_____

[11] At this point in the procedural history, Glock's remaining claims were: (1) the trial court refused to sever his sentencing proceeding from his codefendant's, thereby depriving him of individualized sentencing; (2)

hearing to resolve the historical facts concerning counsel's performance and the mitigating evidence that petitioner contends should have been presented. Glock v. Singletary, 84 F.3d 385, 386 (11th Cir. 1996).

## C.

On remand, the United States District Court for the Middle District of Florida referred the case to a magistrate judge for a hearing and report and recommendation. The magistrate held two days of evidentiary hearings during which time petitioner's counsel examined ten witnesses in order to elicit evidence that petitioner claims his trial attorney, Trogolo, would have discovered at trial had Trogolo's assistance been constitutionally effective. Four classes of evidence were adduced during the hearing:

First, petitioner introduced evidence of physical and emotional abuse at the hands of his biological mother, Carol Harmon, that was more detailed than the evidence of abuse presented at trial. Tammy Simpson,[12] Glock's sister, testified that

---

the trial court failed to find three nonstatutory mitigating circumstances; (3) the trial court's charge to the jury shifted to petitioner the burden of proof on the appropriateness of the death sentence; [and] (4) the trial court's charge to the jury "diluted" the jury's sense of responsibility for the sentence petitioner would receive.

Glock v. Singletary, 84 F.3d 385 (11th Cir. 1996) (footnote omitted).

[12] Tammy Simpson testified at Glock's trial under her unmarried name, Tammy Yonce.

Carol Harmon beat both Glock and her almost daily with a belt or a board, sometimes until the children began to bleed; told the children that she wanted to get rid of them; did not allow the children to play with their peers; made the children wear ill-fitting clothing; would leave the children in the car alone after she had car accidents; and was frequently intoxicated to the point that the children found it necessary to clean her after she vomited. There was corroborating but less dramatic testimony of abuse from Wyman Harmon, Kimberly Gunter (Glock's half-sister), and Carolyn Foster (Wyman Harmon's sister).[13] Geraldine Farless, one of Carol Harmon's coworkers in 1963, testified that Carol Harmon attempted to give Glock to her when he was twenty-one months old. Additionally, petitioner presented much documentary evidence, from former schools and institutions in which he had resided, which constituted further evidence of childhood abuse.

Second, petitioner introduced completely new evidence of abuse at the hands of his stepmother, Willie Mae Glock, from the time Glock was fourteen until he enlisted in the United States military at the age of eighteen.[14] Evidence of abuse

---

[13] Specifically, Carolyn Foster testified that Carol Harmon would force Glock and his sister, Tammy, to stand in a corner for hours, while failing to give the children any rational explanation as to why they were being punished.

[14] Glock was transferred from his biological mother's home to the Epworth Children's Home at the age of thirteen. When petitioner was fourteen, his biological father, Robert Glock, Sr., removed Glock from the Children's Home and brought him

during this period was not presented during the penalty phase of Glock's trial. Both Peggy Brooks and Brenda Skiba, Glock's stepsisters,[15] testified that Willie Mae Glock beat petitioner with her hands, a belt, and a switch; pushed him up against a wall; and had physical confrontations with her husband, Robert Glock, Sr. Both also testified that their stepfather, Robert Glock, Sr., sexually molested them (but not Glock) well into their teen years. During the evidentiary hearing, Trogolo, Glock's attorney at trial, testified that he was uncertain whether he would have presented the evidence of physical and emotional abuse from Willie Mae Glock, and the evidence of Robert Glock, Sr.'s, sexual abuse of his stepdaughters, had he been aware of it. Such evidence would have conflicted with his strategy of depicting an affectionate and loving family who could be a support system and assist in Glock's rehabilitation.[16]

---

to Fort Myers, Florida to live with him, his wife, Willie Mae Glock, and their children. Glock remained with his father and stepmother until he enlisted in the military at the age of eighteen.

[15] Peggy Brooks and Brenda Skiba are the biological daughters of Willie Mae Glock (Glock's stepmother), and the stepdaughters of Robert Glock, Sr. (Glock's biological father). They lived with Glock in Fort Myers from the time he was fourteen until he was eighteen.

[16] During the evidentiary hearing, the following exchange took place between Trogolo and the state's attorney:
> Q: Well, that would have kind of undercut your scenario or your theory that you wanted to present to the jury, would it not, that there was a loving family relationship between Mr. Glock, Senior, and Willie Mae and Tammy Yonce toward the defendant?
> A: I think that would have undercut the jury viewing it that way.

17

Third, petitioner presented additional evidence, not presented at trial, that he was dominated by his codefendant, Puiatti.[17] Tammy Simpson testified that Puiatti "was a very aggressive person. He was like, you know, we're going to have pizza tonight. And Bobby was like, 'Okay.' Bobby was very – Carl led the group. Carl was definitely the speaker of the gang, so to speak." Additionally, Dr. James Larson, a licensed psychologist, testified that his examination of Glock revealed that petitioner was short in stature, and therefore easily intimidated by those in his peer group.

Finally, petitioner presented evidence of mental disorder that supplemented the evidence presented at trial. Dr. Larson testified that Glock has a poor self-concept, distances himself from others, has inadequate personal relationships, suffers from dependency, has self-defeating traits, schizoid traits, and suffers from post-traumatic

----

. . . .

I guess at the time that – at the time of the trial, I was trying to portray that as a, for lack of a better word, a loving home environment; and secondly, that in general, [the sexual molestation evidence is] the type of evidence that I would say could cut both ways. In other words, I didn't want them focusing on Mr. Glock, Senior's, activities or wondering what Bobby's involvement was in that.

[17] Evidence of domination would support a finding that "[t]he defendant acted under extreme duress or under the substantial domination of another person." Fla. Stat. Ann. § 921.141(6)(e); this statutory mitigating circumstance was not found by the sentencing judge at trial.

18

stress disorder, indicating that "he's had a history of traumatizing experiences."[18] And Dr. Gerald Mussenden, who testified at Glock's trial, told the court that with all of the evidence that had been revealed about Glock's childhood abuse, much of what was just speculation at trial, concerning Glock's self-defeating and dependent traits, could have been substantiated as fact.

The magistrate judge issued a report detailing the factual findings of the court, and a recommendation that the writ be denied. The district court adopted the magistrate's report and recommendation, overruled all of the petitioner's objections to the magistrate's finding of facts, and denied the writ of habeas corpus. Petitioner now appeals both the district court's findings of fact, and the district court's denial of the writ.

---

[18] Dr. Larson's examination of Glock included an administration of the Minnesota Multiphasic Personality Inventory, and the Millon Multiaxial Clinical Number Three. In sum, Dr. Larson testified that Glock is,

> [a]n individual who is not trusting of others, who doesn't readily get interpersonal needs met or other needs met from others, a person who has a lot of emotional inner turmoil, a lot of anxiety, bouts of depression, underlying – there's a lot of underlying anger particularly toward women. And, of course, the reason there is fairly obvious: The two major caretakers in life were relationships – were relationships that were very conflicted.
>
> The pattern is of a person who is of at least average intelligence but whose education understanding is somewhat like Swiss cheese; that is, there are a lot of holes in it.

II.

Whether a criminal defendant has received the effective assistance of counsel is a mixed question of law and fact and is subject to de novo review. The underlying factual findings of the district court are presumptively correct unless clearly erroneous. Bush v. Singletary, 988 F.2d 1082, 1089 (11th Cir. 1993).

III.

A.

Petitioner initially argues that the district court erred in omitting numerous facts relevant to whether Glock has established that his trial counsel's deficient performance prejudiced the outcome of the penalty phase of his trial.[19] The district found that the facts petitioner sought to add were primarily repetitive and cumulative to those presented in the more than eighty pages of facts set forth in the magistrate's report and recommendation, which the district court adopted. After an exhaustive

---

[19] As discussed, infra, in order to make out an ineffective assistance claim under Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), petitioner must demonstrate both (1) deficient performance by his attorney at trial, and (2) actual prejudice to the defense. Glock argues that the district court erred with regard to its finding of facts relevant to both the deficient performance and the prejudice prongs of the analysis. Because we find the prejudice issue to be dispositive, we do not address either the substance of petitioner's deficient performance argument, or petitioner's claims of error with regard to the district court's fact-finding relevant to the deficient performance prong.

review of the magistrate's report, and the almost 400 pages of testamentary evidence adduced during the evidentiary hearing on remand, we conclude that the district court's findings of fact are not clearly erroneous.

B.

Having accepted the district court's findings, we come now to the heart of petitioner's claim: that he was denied constitutionally effective assistance of counsel during the penalty phase of his trial. The test for whether counsel provided the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments was articulated by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Under Strickland, a person asserting a claim of ineffective assistance must satisfy a two-pronged test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. To satisfy the prejudice prong of the analysis, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

21

reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068.

In a capital case, this two-part test applies to claims of ineffective assistance during both the guilt and penalty phases of the trial because a

> capital sentencing proceeding . . . is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial – to ensure that the adversarial testing process works to produce a just result under the standards governing decision.

Id. at 686-87, 104 S. Ct. at 2064 (citations omitted). Petitioner argues that he was denied constitutionally effective assistance during the penalty phase of his trial because his counsel failed to discover, through routine investigation, evidence of petitioner's childhood abuse, mental disturbance, and domination by his codefendant. Glock contends that had the court been apprized of this mitigating evidence, he would have received a sentence of life imprisonment rather than death. He thus argues that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2069. Because we find that petitioner has not satisfied the prejudice prong of the Strickland analysis, we do not address whether counsel's performance was deficient.

Following, we first address the evidence adduced during the evidentiary hearing that we find to be primarily cumulative to the evidence that was presented during the penalty phase of petitioner's trial. This includes the evidence of abuse that Glock suffered at the hands of his biological mother; evidence that Glock was laboring under the substantial domination of his codefendant, Puiatti, when he participated in the murder of Sharilyn Ritchie; and some of the evidence of Glock's mental disturbance. Second, we address the entirely new category of evidence that Glock has presented. This includes evidence of abuse at the hands of his stepmother, Willie Mae Glock, and testimony from a psychologist who claims that when one examines the whole picture of petitioner's lifetime of abuse at the hands of various family members, it becomes clear that Glock suffers from, among other things, post-traumatic stress disorder.

i.

The substance of much of the evidence that Glock produced during the evidentiary hearing was before the trial court at the penalty phase. The additional evidence of Glock's supposed domination by his codefendant, Puiatti, is the least persuasive evidence of prejudice that petitioner offers. The record reveals that Glock's stepmother, Willie Mae Glock, testified at trial that she doubted whether petitioner's participation in the murder was voluntary, and that Dr. Mussenden told

23

the jury that Glock was easily led by people who could make him feel comfortable. In light of the trial court's specific finding that this evidence did not establish that Glock was under the substantial domination of Puiatti when he committed the crime, there is little reason to think that the evidence now proffered by the petitioner would have had a reasonable probability (or any probability) of swaying the court. The core of Glock's "new" evidence consists of a statement by his sister that she once saw Puiatti suggest that they have pizza for dinner, and petitioner agreed. The testimony from Dr. Larson concerning Glock's tendency to become intimidated by those in his peer group is nearly repetitive of testimony offered during the penalty phase from Dr. Mussenden. This evidence is simply insufficient to undermine our confidence in the outcome of Glock's sentencing hearing.

Glock also offers anecdotal evidence from a variety of sources who corroborate his claim that he suffered from extensive physical and emotional abuse at the hands of his biological mother, Carol Harmon. Additionally, Glock presents evidence that as a result of his lifetime of abuse, he has a poor self-concept, distances himself from others, has inadequate personal relationships, suffers from dependency, and has self-defeating traits. Petitioner argues that had the court had this evidence before it at sentencing, the statutory mitigating circumstance that "the capital felony was committed while the defendant was under the influence of extreme mental or

emotional disturbance," Fla. Stat. Ann. § 921.141(6)(b), as well as numerous nonstatutory mitigators, would have been established. The problem with this argument is that though the trial court did not have before it all of the abuse evidence that petitioner now offers, the substance of the evidence was presented at sentencing. At trial, petitioner's sister testified in some detail about Glock's early childhood abuse ("If we were ten minutes late coming home from school, we were beat. If there was dirty dishes in the house, we were beat."); and this testimony was corroborated by Willie Mae Glock. The "additional" evidence of Glock's mental disturbance is repetitive of what was presented to the jury by Dr. Mussenden. Despite petitioner's presentation of abuse evidence and psychological testimony, the sentencing court specifically rejected the contention that Glock was under the influence of extreme mental or emotional disturbance when he committed the crime. Therefore, "in light of the fact that the substance of [Glock's] mental deficiencies and abusive childhood were presented to the jury, and in light of the [three] strong aggravating circumstances found by the sentencing judge . . . , we conclude that there is no reasonable probability that the jury would have returned a life sentence." Oats v. Singletary, 141 F.3d 1018, 1029 (11th Cir. 1998); see also Marek v. Singletary, 62 F.3d 1295, 1300-01 (11th Cir. 1995) (given the overwhelming evidence against the petitioner, "evidence of an

abusive and difficult childhood would have been entitled to little, if any, mitigating weight").

It is true that we have sometimes found that trial counsel's failure to present evidence of a defendant's personal history or good character is enough to demonstrate prejudice to the defendant at the penalty phase. See Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998); Jackson v. Herring, 42 F.3d 1350, 1368-69 (11th Cir. 1995); Harris v. Dugger, 874 F.2d 756, 763-64 (11th Cir. 1989); Blake v. Kemp, 758 F.2d 523, 534 (11th Cir. 1985). But in those cases, we found prejudice because of counsel's almost complete failure to present any mitigating evidence of significance. See Dobbs, 142 F.3d at 1390 (no evidence of an unfortunate upbringing presented to the court); Jackson, 42 F.3d at 1363 ("Neither lawyer offered any evidence regarding Jackson's personal history or background. Counsel were virtually silent during two subsequent sentencing hearings before the trial judge . . . ."); Harris, 874 F.2d at 763 (trial counsel had a "total – and admitted – ignorance about the type of mitigation evidence available to them"); Blake, 758 F.2d at 533 (counsel "made no preparations whatsoever for the penalty phase" of defendant's trial). Those cases are a far cry from the instant case, where much of the new evidence that Glock presents is merely repetitive and cumulative to that which was presented at trial.

ii.

This brings us to the evidence introduced at the evidentiary hearing that cannot reasonably be classified as cumulative. This includes the evidence of physical and emotional abuse that petitioner suffered at the hands of his stepmother, Willie Mae Glock, from age fourteen to eighteen, and Dr. Larson's opinion that as a result of a lifetime of abuse and neglect, petitioner suffers from post-traumatic stress disorder. Glock again argues that had the trial court had this evidence before it, the statutory mitigating circumstance of extreme mental or emotional disturbance, and numerous nonstatutory mitigators would have been established; the argument then goes that given these additional factors, there is a reasonable probability that the court would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

In addressing petitioner's argument, it is helpful to understand the rationale animating Florida's scheme of statutory mitigating circumstances. In determining whether sufficient mitigating circumstances exist to warrant the imposition of a life sentence in a capital case, the Florida legislature has found it useful to look to two kinds of evidence: (1) defendant-specific mitigators; and (2) offense-specific

mitigators.[20] Defendant-specific mitigators are those factors that indicate that, regardless of the circumstances surrounding the commission of the crime, the defendant is a good candidate for rehabilitation. Of the seven listed statutory mitigating circumstances, two are indicators of the defendant's rehabilitative potential. These are: "(a) [t]he defendant has no significant history of prior criminal activity;" and "(g) [t]he age of the defendant at the time of the crime." Fla. Stat. Ann. § 921.141(6)(a), (g). That the defendant has no significant history of prior criminal activity indicates that the criminal justice system may be able to intervene at an early stage, and prevent the defendant from becoming a recidivist offender. Likewise, the younger the defendant, the more likely it is that society will be able to step in and impress upon the defendant the counterproductive and antisocial nature of his act.

Offense-specific mitigators focus on the circumstances surrounding the criminal event. This category points to the defendant's lack of full responsibility for the crime, and embraces the notion that while the court does hold the defendant criminally

---

[20] We do not mean to suggest that a Florida trial court could limit its examination of mitigating evidence to that which has been statutorily defined. Indeed, the Eight and Fourteenth Amendments require that the sentencer in a capital case consider any evidence which mitigates against the imposition of the death penalty. Lockett v. Ohio, 438 U.S. 586, 608, 98 S. Ct. 2954, 2967, 57 L. Ed. 2d 973 (1978). Our discussion of the statutory scheme is only meant to provide background concerning those mitigating rationales that the Florida legislature has deemed worthy of codification.

responsible (and thus finds him "guilty"), the defendant has some excuse for his act that mitigates in favor of imposing a sentence of life rather than death. Five of the seven statutory mitigators share an offense-specific thrust. These are: "(b) [t]he capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;" "(c) [t]he victim was a participant in the defendant's conduct or consented to the act;" "(d) [t]he defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;" "(e) [t]he defendant acted under extreme duress or under the substantial domination of another person;" and "(f) [t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Fla. Stat. Ann. § 921.141(6). To one degree or another, all of these mitigating circumstances serve as proxies for a finding that the defendant cannot be deemed fully responsible for his criminal act.

When Glock's attorney, Trogolo, assisted Glock during the penalty phase of the trial, his strategy was to present both kinds of evidence. The gist of his argument was that (1) Glock cannot be held fully responsible for his crime because his early childhood abuse caused some degree of mental disorder during his adult years, and because he was dominated by his codefendant; and (2) Glock was a good candidate for rehabilitation because his past behavior indicated that he was not a likely

recidivist, and because he had a loving and supportive family who could assist him in adjusting to law-abiding behavior. A key component of petitioner's rehabilitation argument was the presentation of Glock's stepmother, Willie Mae Glock. She was the cornerstone of Glock's loving and supportive family scenario, and thus provided the critical testimony relevant to whether Glock had a family network who could help prevent his commission of crimes in the future.[21]

Petitioner now argues that his attorney should have presented evidence of physical and emotional abuse at the hands of Willie Mae Glock, and evidence of petitioner's resulting post-traumatic stress disorder. Had Glock's attorney presented such evidence, however, his argument that Glock was a good candidate for rehabilitation would have been thrown out. The argument that Glock had a loving and supportive family who could help rehabilitate him (as evidenced by the testimony of Willie Mae Glock) is fundamentally inconsistent with the idea that Willie Mae was so abusive towards Glock that he developed a mental disorder at her hands. At trial, Glock was able to play both sides of the coin. He presented just enough offense-specific evidence to allow a jury to conclude that he could not be held fully responsible (e.g., a tormented childhood, and domination by his codefendant); at the same time, Glock presented enough defendant-specific evidence of his past record of

---

[21] Glock could have become a recidivist offender, even though incarcerated.

lawful behavior and a loving family network to give the impression that he was not a likely recidivist. But Glock was walking a thin line because the more evidence of mental disturbance and abuse that he presented, the less likely it is that the court would have found he was a good candidate for rehabilitation. If Glock was so out of control at the time of the criminal event that he could not be held fully responsible, then what could possibly lead a court to believe that he would suddenly gain sufficient control of his faculties to prevent him from committing criminal acts in the future?[22] Throw out Willie Mae Glock's testimony and the loving family scenario, increase the evidence of mental disturbance and abuse, and Glock would have had no hope of a finding of rehabilitative potential.[23]

---

[22] We do not mean to suggest that the likelihood that a Florida court will find that the defendant is a good candidate for rehabilitation, and the chances that the same court will find that the defendant has presented convincing offense-specific mitigation, are always inversely related. Though we do think that the principle has some more general applicability, our specific conclusion is limited to the facts of the instant case.

[23] We note that petitioner argues that his attorney should have increased the offense-specific evidence, and decreased the defendant-specific evidence, despite the fact that the one statutory mitigating circumstance found by the trial court was defendant-specific related – that Glock had no significant history of prior criminal activity. In light of this, throwing out the substance of Glock's rehabilitation argument would seem particularly unadvised. It is true that the trial court still would have found the particular statutory mitigator, absence of a history of criminal activity, was established by the defense. However, once one understands that this mitigating circumstance is a proxy for the larger question of whether the defendant is likely to become a recidivist offender, one realizes that without other evidence of Glock's

31

Petitioner argues that the jettisoning of the rehabilitation argument is of no moment, because with the additional evidence of abuse and mental disorder, the court would have found the statutory mitigating circumstance of "extreme mental or emotional disturbance," Fla. Stat. Ann. § 921.141(6)(b), and numerous nonstatutory mitigators. But again, when we examine the likelihood that petitioner's new evidence would have had the desired effect, we find that there is no reasonable probability that he would have established additional mitigating circumstances. Glock's argument that he was suffering from post-traumatic stress disorder as a result of a lifetime of physical and emotional abuse would have been greatly undermined by three pieces of evidence that the state would have presented to the court. First, Glock's theory of a continuing mental disorder that stemmed from childhood abuse is inconsistent with the fact that he had a moderately successful career in the military from the age of eighteen until he was honorably discharged at age twenty. The murder of Sharilyn Ritchie was committed when Glock was twenty-two years old, fours years after he had left Willie Mae Glock's abusive home, and two years after he was able to pull himself together enough to serve in the military. It seems unlikely that the trial court would

_____

rehabilitative possibilities (i.e., evidence of a supportive family network), the weight given to the statutory mitigator would have diminished. In other words, the testimony of Willie Mae Glock made the fact that Glock had no significant history of prior criminal activity more helpful to petitioner than if no such testimony had been presented.

32

have found that Glock was suffering from some extreme mental or emotional disturbance at the time of the crime, when the murder took place so long after Glock left the abusive environment and then was able to serve in the army.[24] Second, the court would have wondered why Glock emerged from his stepmother's home as such a violent criminal, when both of his stepsisters who endured abuse that was at least as traumatic as that which Glock experienced, including sexual assault by their stepfather, did not engage in criminal activity. Finally, the state would have had access to conflicting psychiatric expert testimony that would have counteracted testimony from Dr. Larson concerning Glock's post-traumatic stress disorder. During the evidentiary hearing, the state called Dr. Sidney Merin, who testified that his review of the record indicated that there was no evidence to support petitioner's post-traumatic stress disorder claim.[25] During the penalty phase, the state would have had

---

[24] In fact, petitioner used evidence of his military career during the penalty phase of his trial. During his closing argument to the jury, petitioner's attorney argued that "Glock's prior military service" constituted a nonstatutory mitigating factor. The attorney stated, "[t]he evidence is sufficient before you and if you desire to look at it, it characterizes his military service in the United States Army as honorable."

[25] Dr. Merin testified,
[i]n my opinion, he does not have a post-traumatic stress disorder. I don't think there's any doubt that during his early life he was experiencing stress certainly by virtue of the abuse that he had been the victim of.

However, post-traumatic stress disorder as defined by the present literature, the symptoms associated with it were essentially not to be seen

the further advantage of subjecting petitioner to examination by its own expert psychologist, see Fla. R. Crim. P. 3.202(d) (1996 & Supp. 1999),[26] making it even more likely that the court would find the state's psychologist to be a credible witness. This would have diminished petitioner's psychological evidence even further.

---

> in the general nature of [Glock's] personality. There are always some features but not enough to meet the minimum requirements to be identified as a post-traumatic stress disorder.
>
> Firstly, you have to have a severely traumatic event that represents some sort of danger to your life. Well, we could say this is what happened to him when he was a youngster, so that may be a given.
>
> However, the additional symptoms that accrue at a later time would include difficulties concentrating, withdrawal from society, avoidance of contacts with others, startle response, flashbacks, difficulty eating, difficulty sleeping, difficulty developing attachments to others.
>
> There is generally an avoidance of anything that would be characteristic of the original types of stress situations or the trauma that the person experienced. They would avoid anything that would – that might bring about something of that nature. For example, any abuse of someone else, deception, injury to someone else and so on, they would very clearly attempt to avoid that.
>
> Reading about or knowing about violence as might be presented on television, radio, newspapers and so on, they would certainly want to avoid that.
>
> I didn't see anything of that nature in the body of the documents I reviewed.

[26] If the defendant refuses to submit to the state's examination, the court may either order the defense to allow the state's expert to review all mental health reports, tests, and evaluations by the defendant's mental health expert, or prohibit the defense mental health experts from testifying concerning mental health tests, evaluations, or examinations of the defendant. Fla. R. Crim. P. 3.202(e) (1996 & Supp. 1999).

Of course, we do not find that trial counsel made a "tactical" or "strategic" decision not to present the abuse evidence, and evidence of his resulting post-traumatic stress disorder, in the sense that Trogolo actually considered and rejected such a strategy. There is no indication that Trogolo was aware of any of this evidence. Instead, we find that in light of trial counsel's bifurcated strategy of presenting both offense-specific and defendant-specific mitigating evidence, in light of the strength of the defendant-specific rehabilitation evidence, in light of the weakness of the continuing mental disturbance theory that petitioner now proffers, and in light of the fact that the introduction of the further abuse evidence would have meant the exclusion of the supportive family evidence, Trogolo's tack during the penalty phase "would continue to be a reasonable strategy." Bertolotti v. Dugger, 883 F.2d 1503, 1519 (11th Cir. 1989) (finding that even if trial counsel had been aware of evidence of petitioner's psychological impairment, omitting this evidence during the penalty phase in favor of depicting petitioner "as a normal man from a happy and loving family, whose life deserved to be spared" would continue to be a reasonable strategy). We find further that even if petitioner had been able to present his new evidence to the sentencing court, there is no "reasonable probability" that the court would have returned anything other than a sentence of death. Strickland, 466 U.S. at 694, 104 S.

35

Ct. at 2068. Petitioner likely would have fared worse at trial if he had been able to pursue the strategy for which he now argues.

## IV.

For the foregoing reasons, we conclude that the district court's findings of fact are not clearly erroneous. We also hold that Robert Glock has not established that he was prejudiced by his attorney's performance at the penalty phase of his trial. We therefore AFFIRM the district court's denial of Glock's petition for a writ of habeas corpus with respect to his sentence of death.

AFFIRMED.