254 N.J. Super. 390 (1992)
603 A.2d 562
STATE OF NEW JERSEY
v.
JESSE B. LETTS AND RICHARD JOHNSON, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal), Monmouth County.
Decided January 2, 1992.
*392 John Kaye, Prosecutor County of Monmouth, representing the State of New Jersey John P. Johnston, Esq., appearing.
Klitzman and Gallagher, representing the defendant Letts William B. Gallagher, Jr., appearing.
Office of the Public Defender representing the defendant Johnson Terry Merced, P.D., appearing.
O'HAGAN, J.S.C.
In this case the court is asked to decide the validity of a unique drug courier profile, based primarily on the race of the defendants. The Superior Court, Appellate Division, has directed that no rational inference may be drawn from racial characteristics, consequently there was no probable cause to stop the defendants' vehicle and the motion to suppress must be granted.
*393 On April 2, 1991, Neil Layton, a 14 year veteran of the Neptune Township Police Department, assigned for the last four years to the Detective Bureau, observed a car driven by Jesse Letts, a 42 year old white male, on Heck Avenue, west of its intersection with Memorial Parkway. Riding as a passenger was the defendant Richard Johnson, a 33 year old black male. The car stopped in front of Boston Way Village, a housing project in adjacent Asbury Park, which is occupied for the most part, if not exclusively, by black families. It is accurate to say that primarily, if not entirely, lower income persons live in Boston Way Village. The Asbury Park Police Department has compiled statistics establishing that Boston Way Village, in fact, is a very high drug trafficking area. The State asserts that
45% of all drug related incidents encountered by the Asbury Park Police Department between January of 1990 and June of 1991 occurred in Boston Way Village. (Statistics taken from the State's brief.)
After the black male passenger exited the car and walked north into Boston Way Village, the white male driver went west on Heck Avenue. The Detective next saw the Letts vehicle on Embury Avenue, a parallel street one block over. The car was parked on the south side of the street facing towards the east, or Memorial Parkway. The officer concluded that the defendant Letts, after dropping Mr. Johnson off, had gone west on Heck Avenue and taken two left hand turns, coming to rest on Embury Avenue, a parallel street to Heck Avenue.
Detective Layton drove past the car and observed the defendant Letts slouched down in his seat. When the unmarked car passed, the defendant Letts raised a magazine, he had been reading, up by his head, and at the same time turned his head away from the officer. Earlier the officer had observed the magazine placed apparently for reading purposes on the steering wheel. The detective parked his car and observed the defendant Letts, at the same time the officer kept his eye on Boston Way Village. The defendant Johnson next appeared 15 minutes later as he walked out of Boston Way Village across *394 the church parking lot, down through an alley which is behind a plumbing supply house, and ultimately entered into the passenger's side of the Letts car which then immediately drove off. The officer was familiar with the area and concluded that when Mr. Johnson exited Boston Way Village, he could not have seen the Letts car because the plumbing supply building would have obstructed the view.
After the car drove off, the detective pulled off in pursuit and shortly pulled the Letts car over on Memorial Parkway. Detective Layton candidly indicated that there was no motor vehicle infraction that he had observed and further that he could not relate any furtive movements or other suspicious activities on the part of either defendant aside from the facts noted above. In the course of the motor vehicle stop, a white powder, suspected to be cocaine, was observed on the console separating the two front seats. After the defendants exited the car, additional CDS and paraphernalia were found by the detective and his backup police officer. Each defendant conceded at the hearing that if the motor vehicle stop were found to be constitutionally valid there was nothing constitutionally impermissible about the actual discovery of the CDS in the car and on the person of the two defendants. Thus, the narrow issue to be resolved here concerns whether the police had a valid basis to stop the Letts' car on Memorial Parkway for investigatory purposes.
The State asserts that the conduct of the two defendants considered in the light of Detective Layton's experiences established
... an articulable and reasonable suspicion ... that the ... occupants [were] subject to seizure for violation of law. Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979).
In his testimony, Detective Layton established that he had been involved with 100 drug arrests in the area of Boston Way Village. The detective had earlier been assigned to the Neptune Township Street Crimes Unit, the Monmouth County Narcotics *395 Strike Force, and had conducted numerous surveillance details in the course of investigating narcotic trafficking.
Detective Layton contended that a most familiar pattern known to law enforcement officers involves a white drug user employing a black person to make a drug purchase for him in an area such as Boston Way Village. Typically the two participants will approach Boston Way Village in a motor vehicle and the black will exit the car on Heck Avenue and walk a short distance to Boston Way Village. In the night time hours, typically the white driver will park the car on Heck Avenue and await the return of the drugs. In fact, when the defendant Johnson exited the car there were parking spaces available on Heck Avenue. Since it was daylight, however, the defendant Letts drove away only to return to nearby Embury Avenue. The detective's suspicions were thus further heightened as the officer explained that during the daylight hours, law-abiding residents of Boston Way Village will frequently call the police describing the pattern of a drug transaction. To avoid this, white drug customers, according to Detective Layton, will then typically park a short distance away to deflect any suspicion. As the detective kept the Letts car under his observations, his suspicions in his mind were confirmed by the conduct of Letts slouching down in the car and attempting to hide his face. The officer determined to make the investigatory automobile stop after he observed the defendant Johnson return in a very short time and walk unerringly to the Letts' car parked on another side street even though the car was hidden from view as Johnson exited from Boston Way Village. In Detective Layton's mind, 15 minutes was consistent with Johnson acquiring the drugs and returning to his customer Jesse Letts.
In Detective Layton's view, he was taking a pragmatic approach borne out by his experiences as a police officer. The experiences he related were consistent with what other officers had told him concerning drug transactions involving white customers in this area.
*396 By no means or by any stretch of the imagination, is Detective Layton a racist. However, while he described the fact pattern as a typical drug profile, a prime factor in his mind was that the driver was white and the passenger was black. On the other hand, in his mind, it was important that each occupant was male. If either occupant had been a female, he would have assumed there was a personal or perhaps romantic relationship involved as opposed to drug trafficking. Because the race of the two defendants and their conduct was consistent with a typical drug transaction involving a white motorist nearby Boston Way Village, the detective made his investigatory stop of the Letts car.
There can be no question that a police officer has the duty to investigate suspicious behavior. State v. Davis, 104 N.J. 490, 503, 517 A.2d 859 (1986). Consistent with his duty to protect the public, a police officer must investigate behavior that suggests that criminal activity may soon be or has already been undertaken. Id. Some commentators have, therefore, stated that a police officer is derelict in his duty if he does not investigate suspicious behavior. State v. Dilley, 49 N.J. 460, 468, 231 A.2d 353 (1967); State v. Gray, 59 N.J. 563, 567, 285 A.2d 1 (1971).
The law recognizes that police officers, because of their training and work experience, will recognize suspicious activities that the lay person might think innocuous. Lafave, Search and Seizure, § 9.3(c) at 448 (1987). Further, a series of actions which by themselves appear innocent will establish a pattern which in the officer's mind is suspicious and warrants investigation. Id. The lay person observing the same facts may observe nothing significant or fail to draw any conclusion even though observing a pattern of behavior which in retrospect is suspicious. Id. Oftentimes, lay people are astounded when a trained police officer unearths ongoing criminal activity in their neighborhood or business.
*397 The police may act upon this suspicious behavior, Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884-85, 20 L.Ed.2d 889, sometimes to investigate and in certain limited situations, the police may stop and question either a pedestrian or motorist. United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In those limited circumstances, as long as the inquiries or actions taken by the police are consistent with the underlying reason for the suspicion, the results of the investigation may be used by the State in a subsequent prosecution. Davis at 505, 517 A.2d 859. In the circumstance noted above, the police may stop a suspect even if the officer lacks probable cause. Id. This stop for investigative purposes may be made even though it is a seizure under the Fourth Amendment. United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The police officer making the investigative stop must be able to describe something more than a hunch or an unreasoned suspicion that criminal actions are underway. U.S. v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The officers' suspicions need not consist of evidence needed to effectuate an arrest. State v. Hope, 85 N.J. Super. 551, 554, 205 A.2d 457 (App.Div. 1964), or constitute proof of criminal activity by a preponderance of the evidence. U.S. v. Sokolow, supra. The determination of reasonable suspicion justifying an investigative stop is established by the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Each case is therefore fact sensitive. The officer need not have to be certain that criminal activity is underway. Rather, he must articulate a basis to believe criminal action is either planned for the imminent future or presently underway using common sensical reasoning. U.S. v. Cortez, supra. Directly put, a
police officer can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot ... U.S. v. Sokolow, supra, 490 U.S. at 7, 109 S.Ct. at 1585.
When a number of factors come together, to give the police, articulable and reasonable suspicion of drug activity, the *398 courts on occasion have labeled the suspicion a drug courier profile. U.S. v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989). An examination of the cases holding a valid drug courier profile, as contrasted with the facts in Letts/Johnson compels that the defendants' motion to suppress evidence be granted.
In Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1984), the court found the articulable, reasonable suspicion needed to make an investigatory stop. In Royer, the defendants' stop in an airport by Federal Drug Enforcement Administration agents was based on the following factors: (1) The defendant was young; (2) appeared to be nervous; (3) paid for his one-way ticket in cash to New York City (a source city for drugs); (4) had an incorrectly labeled luggage identification tag; and (5) was travelling under an assumed name. Id. 103 S.Ct. at 1322. It is important to note that race was not a factor taken into account by the agents in the profile.
United States v. Sokolow, supra, presents a similar fact pattern. At the time of the defendants' investigatory stop, DEA agents knew the following: (1) The defendant had paid over $2100 in cash for two airplane tickets from a roll of $20 bills; (2) the defendant had travelled under an assumed name; (3) the defendant stayed in Miami (a source city for drugs) only 48 hours and then returned to Honolulu which round-trip entailed 20 hours of flight; (4) the defendant was young; (5) the defendant had checked none of his luggage; and (6) the defendant appeared nervous. Id. 109 S.Ct. at 1583-1584. Once again, in this valid drug courier profile stop, race was not a factor related to the profile.
In the case at bar, the drug courier profile can best be summarized as follows: (1) The defendants had parked near a source area for drugs during the daytime; (2) the defendants were a youthful black and an older white male together; (3) the officer observed the black man step out of the car, head into the source area for drugs, and then return to the car at a *399 different, apparently pre-arranged destination; and (4) during the incident the older, white male read a magazine apparently to avoid facial contact with the unmarked patrol vehicle. The detective testified that the racial make-up of the defendants was the primary factor arousing his suspicion that drug activity was afoot.
While the court does not look at the facts in an isolated fashion but rather considers the entire picture, certain facts as per case law can not be considered at all. As established in the testimony, the primary fact on which the officer relied was the race of the white driver. That is, a white male driver and a black male passenger interacting nearby a high drug trafficking area. The Appellate Division of the Superior Court has specifically and without equivocation directed this fact must not be considered in any fashion.
No rational inference may be drawn from the race of [a person ... that he may be engaged in criminal activities. State v. Kuhn, 213 N.J. Super. 275, 281, 517 A.2d 162 (App.Div. 1986).
The facts of Kuhn are similar to the case at bar in that a primary factor drawing suspicion to the defendants was their race. The defendants, in Kuhn, happened to be two Hispanics outside of a car and a Caucasian inside the car located in a "high crime" area. Id. The defendants' actions in Kuhn were also consistent with that of a drug transaction, apart from racial make-up. Nevertheless, the court held that there was no articulable, reasonable suspicion to stop the defendants.
The State cannot, therefore, draw an inference regarding the defendant driver's race as a linchpin leading to the conclusion probable drug activity was "afoot". When this is understood, there is little left to support the officer's suspicion. Whether one examines the facts individually or in the entirety, the State is left with a situation where one person is let out of a car nearby a high drug trafficking area while the driver awaits his return on a nearby side street. A myriad of reasons can explain this behavior many of which are not suspicious. There are reasons why a white person will decide to await the return *400 of his friend away from a housing project occupied primarily by persons of a different race. By itself, without using the inference of drug activity based on race, this activity does not warrant suspicion. Innocent prior arrangement between the two friends can certainly explain the deliberate journey of Mr. Johnson through the parking lot, down the alleyway, into the Letts car. Absent the pragmatic approach of Detective Layton, based upon his experiences as a police officer in Neptune Township, the State is left with no articulable reason to suspect the defendant Jesse Letts of criminal activity. Slouching down in the car and turning one's head away by itself is not suspicious. Lafave, Search and Seizure, § 9.3(c) at 451 (1987). Particularly is this so when one considers that Detective Layton was in plain clothes and driving an unmarked police vehicle. The police thus did not have a valid legal basis to make a motor vehicle stop. State v. Carpentieri, 82 N.J. 546, 414 A.2d 966 (1980).
Considering the clear direction given by the Appellate Division in State v. Kuhn, supra, this court has no alternative but to grant the motion suppressing evidence found as a result of a search on Memorial Parkway.