776 So.2d 243 (2001)
Robert D. GLOCK, II, Petitioner,
v.
Michael W. MOORE, Secretary, Department of Corrections, State of Florida, Respondent.
Robert D. Glock, II, Appellant,
v.
State of Florida, Appellee.
Nos. SC00-2432, SC00-2535.
Supreme Court of Florida.
January 5, 2001.
*245 Terri L. Backhus of Backhus & Izakowitz, P.A., Tampa, FL, for Petitioner/Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry and Scott A. Browne, Assistant Attorneys General, Tampa, FL, for Respondent/Appellee.
PER CURIAM.
Robert D. Glock, a prisoner under sentence of death and scheduled for execution on January 11, 2001, appeals the trial court's order summarily denying his successive motion for postconviction relief. Glock also filed a separate petition for writ of habeas corpus in this Court. Both the successive motion and the petition were filed after the November 14, 2000, signing of the death warrant. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons stated below, we affirm the trial court's order denying postconviction relief and we deny Glock's petition for writ of habeas corpus.

FACTS AND PROCEDURAL HISTORY
Glock was charged and convicted of first-degree murder, kidnapping, and robbery and was sentenced to death. We detailed the facts of this case in our initial opinion as follows:
The trial record reflects that on August 16, 1983, the woman victim arrived at a Bradenton shopping mall. As she exited her automobile, Puiatti[1] and Glock confronted her, forced her back inside the car, and drove away with her. They took $50 from her purse and coerced her into cashing a $100 check at her bank. They then took the victim to an orange grove outside Dade City where they took the woman's wedding ring and abandoned her at the roadside. After traveling a short distance, the appellants determined that the woman should be killed, and they returned in the car to her. When the car's window came adjacent to the woman, Puiatti shot her twice. The appellants drove away, but, when they saw she was still standing, they drove by the victim again and Glock shot her. When the woman did not fall, the appellants made a third pass with the automobile, Glock shot her another time, and the woman collapsed.

*246 Four days later, a New Jersey state trooper stopped the victim's vehicle because its license plate was improperly displayed. Puiatti and Glock occupied the automobile. When neither appellant could present a valid driver's license, the officer requested the car's registration. As Puiatti opened the glove box, the trooper saw a handgun. The officer seized that handgun, searched the vehicle, and uncovered another handgun. He then arrested both men for possession of handguns without permits. The police later identified the handgun from the glove box as the murder weapon.
The next day Puiatti and Glock individually confessed to the kidnapping, robbery, and killing. These initial confessions varied only to the extent that each blamed the other as instigator of the killing and each offered a differing sequence of who fired the shots at the victim. Each confessor admitted he had fired shots at the victim. Three days later, on August 24, Puiatti and Glock gave a joint statement concerning their involvement in the murder. In this joint confession, the appellants resolved the inconsistencies in their prior statements: they agreed that Glock initially suggested shooting the victim and that Puiatti fired the first shots and Glock fired the final shots.
Before trial, both appellants moved to sever their trials on the grounds that the state intended to introduce each appellant's individual confession. The trial court denied their motions. At trial, neither appellant testified in his own behalf, and the three confessionsthe two individual confessions and the joint confessionwere admitted in evidence. The appellants objected only to the introduction of the individual confessions. The trial court overruled appellants' objections, but, before admitting each individual statement, the trial court admonished the jury to disregard each defendant's individual confession as it tended to implicate the other.
The jury found each appellant guilty of first-degree murder, kidnapping, and robbery. In the penalty phase, Puiatti waived any reliance on the mitigating factor of no significant prior criminal history, but offered psychiatric testimony indicating he was under Glock's substantial domination. Glock claimed the application of the mitigating factor of no significant prior criminal history and introduced psychiatric evidence suggesting that he would not have participated in the crime but for his association with Puiatti. The jury, by an 11-to-1 vote, recommended imposition of the death penalty for both Puiatti and Glock.
The trial judge, in accordance with the jury recommendation, imposed the death penalty on both appellants, finding no mitigating circumstances and the following three aggravating circumstances: (1) the murder was committed to avoid arrest [section 921.141(5)(e), Florida Statutes (1983)]; (2) the murder was committed for pecuniary gain [section 921.141(5)(f), Florida Statutes (1983)]; and (3) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification [section 921.141(5)(i), Florida Statutes (1983)].
Puiatti v. State, 495 So.2d 128, 129 (Fla. 1986), vacated in part, 481 U.S. 1027, 107 S.Ct. 1950, 95 L.Ed.2d 523 (1987).
Glock appealed his murder conviction and death sentence, but he did not appeal his convictions for kidnapping and robbery.[2] We affirmed on direct appeal.[3] *247 See Puiatti, 495 So.2d at 128. Thereafter, Governor Bob Martinez signed a death warrant, setting execution for January 17, 1989, and Glock filed a rule 3.850 motion for postconviction relief in the trial court. The trial court summarily denied each of Glock's claims.[4]See Glock v. Dugger, 537 So.2d 99 (Fla.1989). Glock appealed to this Court, and he also filed a petition for writ of habeas corpus and request for stay of execution. See id. at 100. As stated by this Court, Glock raised two principal claims: "(1) that the admission of codefendant Puiatti's confession violated Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), and Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); and (2) that trial counsel was ineffective in failing to obtain additional information from Glock's family to aid the mental health experts in showing deficiencies in Glock's personality that affected Glock's confession and presentation of evidence in the penalty phase." Glock, 537 So.2d at 101-02. This Court rejected these claims, affirmed the trial court's summary denial of the 3.850 motion, denied the petition for writ of habeas corpus, and denied the stay of execution.[5]See id. at 103.
Following this Court's 1989 decision, Glock sought relief in the federal courts by filing a petition for writ of habeas corpus, which the federal district court denied. See Glock v. Dugger, 752 F.Supp. 1027, 1031 (M.D.Fla.1990).[6] On appeal, the *248 Eleventh Circuit set aside the death sentence, finding that the trial court's jury instructions regarding the "heinous, atrocious and cruel" ("HAC") aggravator violated Glock's Eighth Amendment rights as interpreted by Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). See Glock v. Singletary, 36 F.3d 1014, 1027 (11th Cir.1994). Subsequently, the Eleventh Circuit reheard the case en banc and determined, based on an analysis of the principles announced in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), that Glock was not entitled to the benefit of the retroactive application of Espinosa. See Glock v. Singletary, 65 F.3d 878, 890 (11th Cir.1995).[7] The en banc Eleventh Circuit remanded the case to the Eleventh Circuit panel for consideration of Glock's other sentence-related challenges that the panel had not previously addressed. See id. at 891.
On remand, the Eleventh Circuit panel determined that four of Glock's claims were meritless and affirmed the denial thereof, but remanded the case for an evidentiary hearing on the claim of whether Glock's attorney rendered ineffective assistance of counsel in failing to discover and present mitigating evidence. See Glock v. Singletary, 84 F.3d 385, 386 (11th Cir.1996). The federal district court, on remand, referred the case to a magistrate, who held two days of evidentiary hearings during which Glock's counsel examined ten witnesses in order to elicit evidence that Glock claimed his trial counsel would have discovered during trial had counsel been constitutionally effective. See Glock v. Moore, 195 F.3d 625, 632 (11th Cir.1999), cert. denied, ___ U.S. ___, 121 S.Ct. 213, 148 L.Ed.2d 150 (2000). The magistrate issued a report and recommendation that the district court deny Glock's writ of habeas corpus. See id. The district court adopted the magistrate's report and recommendation, and denied the writ. Glock appealed to the Eleventh Circuit, which affirmed the district court's denial. See id. at 626.
Governor Bush signed Glock's death warrant on November 14, 2000, and execution was set for December 8, 2000. Glock thereafter filed an application for stay, which this Court granted, thereby staying execution to and including 6 p.m. on January 10, 2001. Execution was reset for January 11, 2001. On November 20, 2000, postconviction counsel served public records requests on a number of state agencies. On December 1, 2000, the trial court held a status hearing at which it ordered that Glock file his postconviction motion by December 4, 2000. Glock timely filed his motion and the trial court held a hearing on December 7, 2000, at which the court orally denied Glock's motion. The trial court entered its written order on December 18, 2000, and this appeal followed.

3.850 MOTION FOR POSTCONVICTION RELIEF

Adoption of State's Proposed Order
In his first claim on appeal, Glock contends that the trial court erred by adopting the State's proposed order, by failing to write its own order and by summarily denying relief without reviewing the record to determine whether Glock pled sufficient facts to warrant an evidentiary hearing. As to the issue of the adoption of the State's order, this Court has rejected similar challenges where the defendant had notice of the request for proposed orders and an opportunity to submit his or her own proposal and/or objections. See, e.g., Patton v. State, 25 Fla. L. Weekly S749, S750-51, 2000 WL 1424526 (Fla. Sept. 28, 2000); Groover v. State, 640 *249 So.2d 1077, 1078-79 (Fla.1994). In Groover, for example, this Court held that the trial court's adoption of the State's proposed order denying a capital defendant relief on his 3.850 motion did not constitute a due process violation where the trial court signed the State's proposed order three days after defense counsel received a copy and the defendant had an opportunity to argue all of the issues in his brief and at a hearing. 640 So.2d at 1079. The Court explained that even though the defendant did not have the ability to file his own proposed order, his ability to raise objections negated any due process concerns. See id.; see also Hardwick v. Dugger, 648 So.2d 100, 104 (Fla.1994) (holding that verbatim adoption of State's proposed order on a capital defendant's 3.850 motion was not error because both parties stipulated to the filing of post-hearing memoranda, the State served its proposed order on defense counsel months before the trial court signed the State's order, and defense counsel filed an extensive response to the State's proposed order).
On the other hand, this Court has found a due process violation to exist when the defendant was not served with a copy of the State's proposed order or given an opportunity to file objections. See Rose v. State, 601 So.2d 1181, 1182 (Fla.1992); see also Huff v. State, 622 So.2d 982, 983 (Fla.1993). In contrast to Rose and Huff, in this case Glock's counsel had notice that the trial court asked the State to prepare a proposed order and Glock submitted objections to the State's proposed order.
The two cases cited by Glock, Maharaj v. State, 25 Fla. L. Weekly S1097, 2000 WL 1752209 (Fla. Nov. 30, 2000), and Card v. State, 652 So.2d 344 (Fla.1995), are clearly distinguishable, because those cases concerned the State's preparation of a sentencing order.[8] We thus find no error in this case as a result of the trial court's adoption of the State's proposed order summarily denying Glock's successive motion for postconviction relief. Further, we find no merit to Glock's assertion that the trial court failed to conduct a proper review of all the files and records in the case before summarily denying postconviction relief.

Newly Discovered Evidence
The gist of Glock's motion for postconviction relief is a claim of newly discovered evidence that Glock alleges bears directly on the denial of the motion to suppress, which arose from the circumstance of Glock being stopped on the New Jersey turnpike while driving the murder victim's stolen car. Glock's claim of newly-discovered evidence relates to an assertion that the stop was illegal because it was predicated on impermissible racial or drug profiling.[9] He contends that "[n]ewly discovered evidence, released only within the last few days, establishes that the illegal stop by Trooper William Moore on *250 the New Jersey Turnpike seventeen years ago was what led to Mr. Glock's confessions, conviction and eventual sentence of death." Thus, Glock contends that the trial court erred by refusing "to give counsel time to examine the remainder of the 91,000 pages of documents disclosed by the New Jersey Attorney General and amend his Rule 3.850 motion with any new facts he discovered from those documents."
In Jones v. State, 709 So.2d 512 (Fla. 1998), this Court reiterated the standard that must be met in order for a conviction to be set aside based upon newly discovered evidence:
First, in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by use of diligence." Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324-25 (Fla. 1994).
Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. Jones, 591 So.2d at 911, 915. To reach this conclusion the trial court is required to "consider all newly discovered evidence which would be admissible" at trial and then evaluate the "weight of both the newly discovered evidence and the evidence which was introduced at the trial."
Id. at 521. In this case, the trial court's order denying relief on this claim stated that:
The concept of drug profiling has been well known for several years and yet Glock has waited some fourteen years and only now on the eve of execution on a second death warrant presents his current claim. The circumstances surrounding the stop of the vehicle were fully known to him for all those years. He urges that what is new at this time is the disclosure that New Jersey officers have engaged in a practice of disproportionally stopping drivers of a racial minority; it is questionable whether even this is new since among the exhibits he has furnished includes a certificate of a New Jersey criminal defense attorney who asserts that he has been in the process of litigating such claims for the last ten years. (See Appendix 10 to Defendant's Motion to Vacate). The Court concludes that petitioner Glock is untimely in presenting this eleventh hour exercise in speculation to overturn his judgment and sentence.
In particular, the trial court in this case specifically found that Glock's claim was meritless because, among other things:
Trooper Moore testified that he stopped the vehicle because of his observation that the license place was illegible and it is a motor vehicle driver's violation to have the license tags improperly displayed. Glock and Puiatti admitted that their licenses were suspended, and Moore observed the butt of a handgun in the glove compartment when they retrieved the auto registration (R400-404). When Moore patted them down Glock stated there was a gun in the car and had no objection to Moore looking in the car. Moore placed them under arrest for possession of the two guns in the car (R404-406). Moore stated that the only reason he stopped the car was because of the tag (R419).
Petitioner Glock offers nothing now in this proceeding that would challenge in any way Trooper Moore's testimony that he validly stopped the vehicle driven by Glock for an improper display of the license tag in August of 1983. That some troopers years later may have engaged in an impermissible policy of stopping other drivers for illegitimate reasons is irrelevant to the instant case.
. . . .
The Court notes that the evidence shows that Glock and Puiatti confessed not just once in New Jersey but again *251 jointly after their return to Pasco County, all after Miranda warnings.
We agree with the trial court's conclusions regarding the denial of the newly discovered evidence claim on both prongs of Jones.
As to the first prong of Jones, any claim of newly discovered evidence in a death penalty case must be brought within one year of the date such evidence was discovered or could have been discovered through the exercise of due diligence. See Buenoano v. State, 708 So.2d 941, 947-48 (Fla.1998); see also Fla. R.Crim. Pro. 3.851(b)(4) (providing for extension of time for filing of motion for postconviction relief where counsel makes a showing of good cause for the inability to file the postconviction pleadings within the one-year time period). The claim that minorities were subject to a disproportionate number of traffic stops on the New Jersey Turnpike and thus the potential victims of illegal discriminatory enforcement of the traffic laws was a claim that has been known for a number of years, as indicated by reported cases addressing that issue. See State v. Kennedy, 247 N.J.Super. 21, 588 A.2d 834, 836 (1991); see also State v. Ballard, 331 N.J.Super. 529, 752 A.2d 735, 740 (2000); State v. Soto, 324 N.J.Super. 66, 734 A.2d 350, 351 (1996). Further, as the trial court recognized, the expert declaration of New Jersey attorney William Buckman that Glock submitted in support of his motion in this case indicates that Buckman has been representing individuals in cases involving the racial profiling issue for the past ten years. In addition, the New Jersey Attorney General issued an interim report on the issue of racial profiling in April 1999, more than one year before the filing of the motion. Nonetheless, despite this report and these earlier cases, Glock has never before Governor Bush signed this death warrant on November 14, 2000, raised or attempted to pursue this claim. In fact, Glock did not even raise the denial of the motion to suppress or the impropriety of the initial stop as an issue on direct appeal.
We do not find persuasive Glock's additional argument that he would have had no reason to know prior to the November 2000 disclosure of the 91,000 pages of documents that profiling was occurring as early as 1983. Even the most recent records that Glock relies on for his claim of newly-discovered evidence do not actually establish that racial or drug profiling was systematically used in the early 1980's, and such an assertion is speculative at best. For all these reasons, we find this claim to be procedurally barred.
As to the second prong of Jones, even if we were to find that this claim was not procedurally barred, we do not find that the motion was sufficiently pled to give rise to a legal claim for relief that would probably produce an acquittal on retrial in this case. In order to prevail, Glock would have to show that evidence of impermissible racial or drug profiling, if considered in conjunction with other evidence presented, would have resulted in the granting of the motion to suppress based on an unlawful stop.
As we noted on direct appeal, the New Jersey state trooper stopped the victim's vehicle driven by Glock and occupied by Puiatti because the vehicle's license plate was improperly displayed. See Puiatti v. State, 495 So.2d at 129. Nothing that Glock has asserted in his successive motion contradicts that established fact. When neither Puiatti nor Glock could present a valid driver's license, the officer requested the car's registration. See id. As Puiatti opened the glove box, the trooper saw a handgun, which he seized. See id. The officer then searched the vehicle, discovered another handgun and arrested Glock and Puiatti for possession of handguns without permits. See id.
According to the trooper's testimony, an improper display of a license plate constituted a motor vehicle violation under New Jersey law. As we explained *252 in Holland v. State, 696 So.2d 757, 759 (Fla.1997), the violation of a traffic law provides sufficient probable cause to make a lawful stop under the objective test laid out by the United States Supreme Court in Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (constitutional reasonableness of traffic stop is not dependent on actual motivations of individual officers). Thus, this alleged traffic violation provided probable cause for the trooper to stop Glock and Puiatti. See Whren, 517 U.S. at 810, 116 S.Ct. 1769.
On the other hand, as the United States Supreme Court has recognized, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." Whren, 517 U.S. at 813, 116 S.Ct. 1769. Thus, the United States Supreme Court has recognized that "the Constitution prohibits selective enforcement of the law based on considerations such as race." Id.; see also Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race.").
As noted by the trial court, however, Glock, who was the driver of the vehicle, was Caucasian.[10] Therefore, even assuming that an official policy of racial profiling existed in New Jersey as of 1983, it is mere speculation that the stop in this case was connected to such a policy; that is, that the stop was based on race or other invidious classification. Cf. State v. Letts, 254 N.J.Super. 390, 603 A.2d 562, 566 (1992) (granting motion to suppress where detective relied on racial makeup of defendants as primary factor arousing his suspicion of drug activity).
To the extent that Glock claims that his vehicle was stopped because he and Puiatti fit a drug profile, a law enforcement officer's reliance on a "drug courier profile" would not be material to the arrest of a suspect that was otherwise reasonable and supported by probable cause. See United States v. Sokolow, 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). A claim of the use of an impermissible profile, not based on race or other invidious classification, would thus relate to the Fourth Amendment claim of whether the original stop was lawful. In this case, nothing that Glock has asserted casts doubt on the legality of the stop so as to allow a collateral attack on the conviction seventeen years after the stop took place.

The Clemency Claim
Glock was afforded a clemency hearing at the time of his first death warrant, at which time he was represented by counsel. In the current death warrant, Governor Bush attested to the fact that "it has been determined that Executive Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate." Glock now contends that he has been denied access to the clemency process because he was denied the right to present mitigating evidence and denied the right to counsel. In Bundy v. State, this Court rejected a similar argument:
In the final claim raised under his 3.850 motion, appellant contends that he must be allowed time to prepare and present an application for executive clemency before sentence may be carried out in this case. In the death warrant authorizing appellant's execution, the governor attests to the fact that "it has been determined that Executive *253 Clemency, as authorized by Article IV, Section 8(a), Florida Constitution, is not appropriate." It is not our prerogative to second-guess the application of this exclusive executive function. First, the principle of separation of powers requires the judiciary to adopt an extremely cautious approach in analyzing questions involving this admitted matter of executive grace. Sullivan v. Askew, 348 So.2d 312 (Fla.), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 159 (1977). As noted in In re Advisory Opinion of the Governor, 334 So.2d 561, 562-63 (Fla.1976), "[t]his Court has always viewed the pardon powers expressed in the Constitution as being peculiarly within the domain of the executive branch of government." See also Ex Parte White, 131 Fla. 83, 178 So. 876 (1938).
497 So.2d 1209, 1211 (Fla.1986) quoted in Provenzano v. State, 739 So.2d 1150, 1155 (Fla.1999). As in Bundy and Provenzano, Glock now seeks counsel for a second clemency hearing. Although Glock contends that Provenzano and Bundy differ from this case because the Governor, rather than Glock, has initiated the clemency proceeding, this is a distinction without a difference. Moreover, for the reasons stated in Bundy, we reject Glock's arguments with regard to his right to present evidence. Accordingly, we find no due process violation and no merit to Glock's clemency claim.

Public Records
On November 20, 2000, Glock filed demands for public records requests on a variety of different state agencies, pursuant to chapter 119, Florida Statutes (2000), and Florida Rule of Criminal Procedure 3.852(h)(3) and (i). Glock supplemented these demands by additional requests, as well as motions to compel, filed on December 1 and December 5, 2000.
This Court has recently addressed the issue of public records as it arises in cases such as this one, where the request is made after the death warrant has been signed:
The language of section 119.19 and of rule 3.852 clearly provides for the production of public records after the governor has signed a death warrant. However, it is equally clear that this discovery tool is not intended to be a procedure authorizing a fishing expedition for records unrelated to a colorable claim for postconviction relief. To prevent such a fishing expedition, the statute and the rule provide for the production of public records from persons and agencies who were the recipients of a public records request at the time the defendant began his or her postconviction odyssey. The use of the past tense and such words and phrases as "requested," "previously," "received," "produced," "previous request," and "produced previously" are not happenstance.

This language was intended to and does convey to the reader the fact that a public records request under this rule is intended as an update of information previously received or requested. To hold otherwise would foster a procedure in which defendants make only a partial public records request during the initial postconviction proceedings and hold in abeyance other requests until such time as a warrant is signed. Such is neither the spirit nor intent of the public records law. Rule 3.852 is not intended for use by defendants as, in the words of the trial court, "nothing more than an eleventh hour attempt to delay the execution rather than a focused investigation into some legitimate area of inquiry."

Sims v. State, 753 So.2d 66, 70 (Fla.2000) (emphasis added).
In this case, the scope of Glock's public records request is quite broad.[11] Many of *254 the records Glock requested were in fact produced by the various agencies, but some agencies claimed exemptions. It is clear from a review of the record and the hearing that most of the records are not simply an update of information previously requested but entirely new requests.
Nonetheless, Glock has not made a showing as to how any of the records he has requested and has not received relate to a colorable claim for postconviction relief or to a "focused investigation into some legitimate area of inquiry." Id. Moreover, Glock has not shown good cause as to why he did not make these public records requests until after the death warrant was signed. See Bryan v. State, 748 So.2d 1003, 1006 (Fla.1999); Buenoano v. State, 708 So.2d 941, 947 (Fla.1998). Accordingly, based upon the record before us, we hold that the trial court did not abuse its discretion in denying the motions to compel and in determining that Glock's right to public records was not denied under section 119.19, Florida Statutes, and rule 3.852.

PETITION FOR WRIT OF HABEAS CORPUS
In his petition for habeas corpus, Glock claims that his death sentence has been applied in an arbitrary and capricious manner in violation of the constitutional imperatives under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), because he was unable to obtain relief on collateral review for his claim that the "HAC" jury instruction was unconstitutionally vague based on Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). He compares his case with James v. State, 615 So.2d 668 (Fla. 1993), and contends that the differing results between the two cases have led to an arbitrary application of the death penalty.
In James, however, the defendant properly raised the issue in the trial court and again on appeal. 615 So.2d at 669. Glock, on the other hand, failed to raise the issue on appeal.[12] Accordingly, Glock's case is *255 more akin to Lambrix v. Singletary, 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997), in which the United States Supreme Court found no constitutional infirmity in holding that the defendant was not entitled to receive the benefit of the retroactivity of Espinosa. Like Glock, Lambrix properly raised his "HAC" objection at trial, but did not raise the issue on appeal. See Lambrix v. Singletary, 641 So.2d 847, 848 (Fla.1994). This resulted in our finding that the claim was procedurally barred. See id.; see also Henderson v. Singletary, 617 So.2d 313, 315 (Fla.1993) ("The instruction given on the heinous, atrocious, or cruel aggravator was the standard jury instruction found lacking in Espinosa. ... Although defense counsel requested expanded instructions on both aggravating factors and objected when the standard instructions were given, this claim is procedurally barred because a specific challenge to the instructions was not raised on direct appeal.").
Indeed, even in James itself, we held that "[c]laims that the instruction on the heinous, atrocious, or cruel aggravator is unconstitutionally vague are procedurally barred unless a specific objection on that ground is made at trial and pursued on appeal." 615 So.2d at 669. Thus, the fact that James raised this issue on appeal distinguishes James from Glock's case and that distinction does not make the application of the death penalty arbitrary under Furman.[13] Based on the reasons expressed above, Glock's petition for writ of habeas corpus is denied.

CONCLUSION
In sum, we affirm the trial court's denial of Glock's motion for postconviction relief and we deny Glock's petition for habeas corpus. No motion for rehearing will be entertained.
Is it so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
QUINCE, J., recused.
NOTES
[1] Glock's codefedant, Carl Puiatti, was also charged and convicted of first-degree murder, kidnapping, and robbery and was sentenced to death. See Puiatti v. State, 495 So.2d 128, 129 (Fla.1986), vacated in part, 481 U.S. 1027, 107 S.Ct. 1950, 95 L.Ed.2d 523 (1987).
[2] The issues that Glock raised on direct appeal were: (1) whether exclusion at the trial stage of prospective jurors opposed to the death penalty constituted reversible error; (2) whether the trial court erred in failing to sever Glock's sentencing proceeding from Puiatti's; (3) whether the trial court erred in finding the aggravating circumstance of cold, calculated, and premeditated; (4) whether the trial court erred in failing to find as a mitigating circumstance Glock's cooperation with the police and his potential for rehabilitation; and (5) whether the trial court erred in instructing the jurors and receiving their penalty recommendation on a Sunday. See Puiatti, 495 So.2d at 132.
[3] Puiatti thereafter filed a petition for writ of certiorari to the U.S. Supreme Court. See Puiatti v. Florida, 481 U.S. 1027, 107 S.Ct. 1950, 95 L.Ed.2d 523 (1987). The Court granted the petition, vacated the judgment, and remanded the case to this Court for further consideration in light of Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987). See Id., at 1027, 107 S.Ct. 1950. On remand, this Court reconsidered the case in light of the new principles adopted by the U.S. Supreme Court in Cruz, but again affirmed Puiatti's conviction and sentence of death. See Puiatti v. State, 521 So.2d 1106, 1107 (Fla.1988). Glock, however, did not seek certiorari review in the U.S. Supreme Court.
[4] Glock raised the following claims in his 3.850 motion: (1) whether the admission of Puiatti's confession and statements from the joint confession violated Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); (2) whether the trial court erred in not granting a severance at either phase of the trial; (3) whether Glock's counsel was ineffective at the guilt and penalty phases of the trial; (4) whether the trial court unconstitutionally shifted the burden in its instructions concerning sentencing and its imposition of the sentence; (5) whether the mental health experts rendered professionally inadequate evaluations resulting in an unreliable sentencing determination; (6) whether evidence of the victim's character and victim impact evidence were improperly considered by the jury and the court; (7) whether the trial court erred in permitting the prosecutor to state during closing argument at the guilt phase that premeditation was presumed under the felony murder theory; (8) whether the jury instructions and prosecutor's comments violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Adams v. Dugger, 816 F.2d 1493 (11th Cir. 1987), rev'd, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989); and Mann v. Dugger, 844 F.2d 1446 (11th Cir.1988); (9) whether the jury was misled by the sentencing instructions; (10) whether the trial court erred in refusing to provide instructions necessary to guide the jury's discretion in assessing the aggravating factors; (11) whether the prosecutor made an improper "golden rule" argument during his opening statement and made an inflammatory remark during his closing argument; (12) whether Glock's emotional dependency precluded him from knowingly and intelligently waiving his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (13) whether Glock was prejudiced by the joint sentencing proceeding and order; (14) whether the trial court failed to recognize mitigating circumstances in the record; (15) whether the instructions on felony murder violated Glock's constitutional rights; and (16) whether the trial judge erred in refusing to provide the jury with the defense's requested instructions concerning mitigating factors.
[5] The United States Court of Appeals for the Eleventh Circuit ultimately stayed the execution.
[6] In that petition, Glock raised the same sixteen claims that he raised in the state court petition, along with one additional claim: whether Glock was denied the effective assistance of counsel on direct appeal to the Florida Supreme Court. See id. at 1028, 107 S.Ct. 1950.
[7] The U.S. Supreme Court subsequently reached the same conclusion that the Teague doctrine does not require Espinosa's retroactive application. See Lambrix v. Singletary, 520 U.S. 518, 528, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).
[8] This Court has recently recognized the distinction between the adoption of proposed sentencing orders and the adoption of orders on a postconviction motion:

[W]e [have] held the State should not draft the trial court's sentencing order. This statement was based on the fact that a sentencing order is a statutorily required personal evaluation by the trial judge of aggravating and mitigating factors. The evaluation done in the sentencing order is the basis for a sentence of life or death. The sentencing order must be sufficiently detailed to allow this Court to perform its proportionality review, the review which may ultimately determine whether a person lives or dies. On the other hand, a motion for postconviction relief is brought after the judgment and sentence has been affirmed and are presumed correct. The order on postconviction is not a sentencing order; it is a recitation of the facts, law, and reasons for the granting or denial of requested relief.
Patton, 25 Fla. L. Weekly at S751, 2000 WL 1424526 (footnote omitted). See generally Spencer v. State, 615 So.2d 688, 690-91 (Fla. 1993); Patterson v. State, 513 So.2d 1257, 1262 (Fla.1987); Nibert v. State, 508 So.2d 1, 3-4 (Fla.1987).
[9] Glock seems to interchangeably allege both racial and drug profiling, but at oral argument in this case, counsel asserted that the two claims are intertwined, with the core claim being racial profiling.
[10] Although Glock and Puiatti are Caucasian, Glock contends that they "matched the `profile' that the New Jersey State Police were looking for [because t]hey were young, dark haired, dark complected, and driving a car with out-of-state plates northbound on the New Jersey Turnpike." Glock has further argued that Puiatti is Italian American and that documents reveal that Italian Americans were also targeted under the profiling systematically employed in New Jersey.
[11] Indeed, Glock made multiple public records requests of agencies or persons, including:

1. Chief of Police, Palmetto Police Department
2. Director, Division of Elections, Department of State
3. Chief of Police, Fort Myers Police Department
4. Michael W. Moore, Secretary, Department of Corrections
5. Chief of Police, Dade City Police Department
6. Secretary, Department of Business and Professional Regulation.
7. Secretary, Department of Children and Families
8. Records Custodian, Pasco County Jail
9. Records Custodian, Pasco County Sheriff's Department
10. Records Custodian, Florida Department of Law Enforcement
11. Honorable Bernie McCabe, Office of the State Attorney, Sixth Judicial Circuit
12. Records Custodian, Office of the Medical Examiner, District Six
13. Honorable Wayne L. Cobb, Circuit Court Judge, Sixth Judicial Circuit
14. Records Custodian, Pasco County Sheriff's Department
15. Secretary, Agency for Health Care Administration
16. Chief of Police, Lake Worth Police Department
17. Sheriff, Palm Beach County Sheriff's Office
18. Records Custodian, Florida Highway Patrol
19. Regional Administrator, Florida Parole Commission
20. Office of Executive Clemency
[12] Justice Kogan explained this difference in his concurring in part, dissenting in part opinion in Johnson v. Singletary, 618 So.2d 731, 732 (Fla.1993). Noting that James "did not technically involve a procedural bar, because James' counsel had raised a proper objection to the matter at issue there and had argued the matter on appeal," Justice Kogan explained that:

Johnson argues essentially that this Court now should lift the procedural bar applicable to his case on grounds we did something similar in James v. State, 615 So.2d 668 (Fla.1993). In actuality, I find that this Court in James merely applied retroactively the rule of law announced in Espinosa v. State, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), which had been issued while Mr. James' collateral appeal was pending. That is quite a different matter than lifting a procedural bar to reconsider issues now already litigated to finality, some on multiple occasions.
Id.
[13] Although couched in different terms, Glock previously argued to the Eleventh Circuit that this Court's decision in James mandates relief. See Glock, 65 F.3d at 889. In addressing this issue, the Eleventh Circuit stated:

In James v. State, 615 So.2d 668, 669 (Fla. 1993), the Florida Supreme Court held that "it would not be fair to deprive" a petitioner for collateral relief the benefit of Espinosa if the petitioner raised the vagueness of the HAC jury instruction as an issue on appeal. Glock asserts that the retroactivity bar is unnecessary because Teague's comity concerns would not arise if federal courts followed state courts in applying a new rule retroactively. We are unpersuaded, however, that Florida's retroactive application of Espinosa in another case permits us to ignore Teague. When Glock challenged the jury instruction before the Florida courts, they denied relief. It is that denial that Teague requires the federal courts to respect.
Id. (footnote omitted). In the footnote to that passage, the Eleventh Circuit added:
Nothing in James suggests that the Florida Supreme court borrowed or applied the Teague doctrine, which does not apply to state courts. It is also far from clear that Glock would get relief under James retroactivity rule, because unlike James, Glock did not raise the vagueness of the jury instruction as an issue on direct appeal.
Id. at 889 n. 9.